**UNITED STATES DISTRICT COURT**
**MIDDLE DISTRICT OF FLORIDA**
**FORT MYERS DIVISION**

NATIONAL PARKS CONSERVATION
ASSOCIATION and JOHN ADORNATO,
III,

      Plaintiffs,

v.                                                                Case No:  2:11-cv-578-Ftm-29SPC (Lead)

UNITED STATES DEPARTMENT OF
INTERIOR, NATIONAL PARK SERVICE
and UNITED STATES FISH AND
WILDLIFE SERVICE,

      Defendants.

_____/

PUBLIC EMPLOYEES FOR
ENVIRONMENTAL RESPONSIBILITY,
FLORIDA BIODIVERSITY PROJECT,
SIERRA CLUB, SOUTH FLORIDA
WILDLANDS ASSOCIATION,
WILDERNESS WATCH, and                              Case No. 2:11-cv-647-Ftm-29SPC(Member)
BRIAN SCHERF

      Plaintiffs,

v.

KENNETH SALAZAR, Secretary, U.S.
Department of the Interior, JONATHAN
B. JARVIS, Director, National Park Service,
and DANIEL M. ASHE, Director, U.S. Fish &
Wildlife Service,

      Defendants.

# REPORT AND RECOMMENDATION

## TO THE UNITED STATES DISTRICT COURT

This matter comes before the Court on the Parties' Cross Motions for Summary Judgment. Plaintiffs' Joint Motion for Summary Judgment (Doc. #103) was filed on July 30, 2012. Federal Defendants' Combined Memorandum in Support of Cross-Motion for Summary Judgment and in Opposition to Plaintiffs' Joint Motion for Summary Judgment (Doc. #106) was filed on September 7, 2012. Defendant-Intervenor Safari Club International's Combined Cross-Motion for Summary Judgment/Memorandum in Support and Opposition to Plaintiffs' Joint Motion for Summary Judgment (Doc. #108), Florida Wildlife Federation's Cross-Motion for Summary Judgment and Combined Memorandum of Law in Support of Cross-Motion for Summary Judgment and in Opposition to Plaintiffs' Joint Motion for Summary Judgment (Doc. #110), and Intervenor Florida Fish and Wildlife Conservation Commission's Motion for Summary Judgment, Memorandum in Support Thereof, and Memorandum in Opposition to Plaintiffs' Motion for Summary Judgment (Doc. #111) were filed on September 20, 2012. Plaintiffs' Combined Opposition to Defendants' Summary Judgment Motions and Reply in Support of Plaintiffs' Summary Judgment Motion, wherein oral argument was requested, was filed on October 26, 2012 (Doc. #114). Federal Defendants' Reply Memorandum in Support of Cross-Motion for Summary Judgment (Doc. #115) was filed on November 30, 2012. Defendant-Intervenor Safari Club International's Reply in Support of its Cross-Motion for Summary Judgment (Doc. #116) and Defendant-Intervenor Florida Wildlife Federation's Reply in Support of its Cross-Motion for Summary Judgment (Doc. #117) were filed on December 7, 2012. The Court has considered the briefing of the Parties, as well as the administrative record[1] submitted

---

[1] The Court will cite the administrative record as "A.R."

i

to the Court and issues the following Report and Recommendation for the District Court's consideration.

This case involves the issue of the use of motorized recreational off-road vehicles (ORVs) in the Addition Lands of the Big Cypress National Preserve. Plaintiffs challenge the National Park Services' Final General Management Plan/Wilderness Study/Off-Road Vehicle Management Plan/Environmental Impact Statement dated October 2010 ("Addition GMP" or "GMP") and the associated February 4, 2011 Record of Decision ("ROD") concerning ORV use in the Addition Lands. Plaintiffs also challenge Fish and Wildlife Services' ("FWS") related biological opinion ("BO") and associated incidental take statement. Plaintiffs assert violations of various federal statutes, including: (1) the Administrative Procedures Act ("APA"); (2) the Wilderness Act; (3) the National Environmental Policy Act ("NEPA"); (4) the Endangered Species Act ("ESA"); and (5) the National Park Service Organic Act of 1916, the Big Cypress National Preserve Addition Act ("Addition Act"), Executive Orders 11,644 and 11,989, and NPS regulations at 36 C.F.R. § 4.10.[2]   Plaintiffs seek an order vacating the Addition GMP and enjoining the NPS from taking any further action on the Addition GMP.

---

[2] The Court previously granted a motion to dismiss Plaintiffs' eighth claim for relief for failure to state a claim. (Doc. #105).

## <u>TABLE OF CONTENTS</u>

I.   **RELEVANT ENVIRONMENTAL STATUTES AND EXECUTIVE ORDERS**

A.  National Park System and the National Park Service…………………………..1

B.  National Environmental Policy Act …………………………………………1

C.  Executive Orders 11,644, 11,989, and 36 C.F.R. § 4.10………………………..2

D.  Endangered Species Act ……………………………………………………….4

E.  Big Cypress Establishment Act and the Addition Act………………………..5

F.  The Wilderness Act and Related NPS Management Policies…………………..6

II.   **FACTUAL AND PROCEDURAL BACKGROUND**

A.  The Original Preserve and the Addition………………………………………...8

B.  NPS Management of the Original Preserve…………………………………12

C.  NPS Management of the Addition Lands

    1.  The planning process for the Addition GMP/EIS………………….....13

    2.  The Draft GMP/EIS………………………………………………….....15

    3.  Public comments on the Draft Addition Lands GMP/EIS……………16

    4.  The Addition GMP/EIS……………………………………………...21

    5.  The Biological Opinion …………………………………………..24

    6.  The Record of Decision ………………………………………………...26

III.   **DISCUSSION**

A.  Count One:[3] APA Violations of the Wilderness Act…………………………...27

B.  Count Four: Breach of NEPA……………………………………………….....40

    1.  The impact of ORV use on hydrologic resources…………………..43

    2.  The impact of ORV use on the Florida panther………………………..46

---

[3] The Counts were not reviewed in order, but rather in the order which made sense in the context of the allegations.

3. The impact of ORV use on natural soundscapes and non-motorized visitors…………………………………………………………………49

4. The impact of ORV use on vegetation communities and sloughs……..52

5. NPS's reliance on the Original Preserve ORV Management Plan…….55

C. Counts Six and Seven: Endangered Species Act Violations………………..57

1. Eastern Indigo Snake…………………………………………………..60

2. Florida Panther…………………………………………………………...63

(a) Effects of the GMP on the Panther……………………………64

(b) Best Scientific Data Available…………………………………65

(c) Incidental Take Statement……………………………………..67

D. Counts Two and Five: Big Cypress Establishment Act, National Park Service Organic Act, and APA……………………………………………………………70

E. Count Three: Violations of Executive Orders 11,644 and 11,989……………..71

IV. CONCLUSION……………………………………………………………………73

## I. RELEVANT ENVIRONMENTAL STATUTES AND EXECUTIVE ORDERS

### A. National Park System and the National Park Service

The national park system in the United States began with the establishment of Yellowstone National Park in 1872. 16 U.S.C. § 1a–1. In 1916, the National Park Service Organic Act created the National Park Service (NPS) within the Department of Interior. 16 U.S.C. § 1. This federal agency under the United States Department of Interior was required to:

> promote and regulate the use of the Federal areas known as national parks, monuments, and reservations ... as provided by law, by such means and measures as conform to the fundamental purpose of the said parks, monuments, and reservations, which purpose is to conserve the scenery and the natural and historic objects and the wild life therein and to provide for the enjoyment of the same in such manner and by such means as will leave them unimpaired for the enjoyment of future generations.

Id. Thus, national parks are created with a conservation mandate, *i.e.*, to conserve and preserve the scenery, wildlife, and objects (natural and historical) within their boundaries for present and future enjoyment.

### B. National Environmental Policy Act

The National Environmental Policy Act of 1969, 42 U.S.C. §§ 4321–4370 ("NEPA"), established a "national policy [to] encourage productive and enjoyable harmony between man and his environment," and was intended to reduce or eliminate environmental damage and to promote "the understanding of the ecological systems and natural resources important to" the United States. 42 U.S.C. § 4321. NEPA does not itself mandate particular results, but only imposes "procedural requirements on federal agencies with a particular focus on requiring agencies to undertake analyses of the environmental impact of their proposals and actions." Dep't of Transp. v. Pub. Citizen, 541 U.S. 752, 757-58, 124 S.Ct. 2204, 159 L.Ed.2d 60 (2004); see also Citizens For Smart Growth v. Sec'y, Dept. of Transp., 669 F.3d 1203, 1211 (11th Cir.

2012); Sierra Club v. Van Antwerp, 526 F.3d 1353, 1360 (11th Cir. 2008). NEPA compliance must take place before decisions are made in order to ensure that those decisions take environmental consequences into account. Wilderness Watch v. Mainella, 375 F.3d 1085, 1096 (11th Cir. 2004).

### C. Executive Orders 11,644, 11,989 and 36 C.F.R. § 4.10

In response to a general increase of ORV use on public lands, in 1972 President Richard M. Nixon issued an executive order for the purpose of "establish[ing] policies and provid[ing] procedures that will ensure that the use of off-road vehicles on public lands will be controlled and directed so as to protect the resources of those lands, to promote the safety of all users of those lands, and to minimize conflicts among the various uses of those lands." Exec. Order No. 11,644, 37 Fed. Reg. 2877 (Feb. 8, 1972), as amended by Exec. Order No. 12,608, 52 Fed. Reg. 34617, Sec. 21 (Sept. 9, 1987). This Executive Order, intended to further the purpose and policy of NEPA, required the Secretaries of the Departments of Interior, Defense, and Agriculture (and the Tennessee Valley Authority) to "develop and issue regulations and administrative instructions ... to provide for administrative designation of the specific areas and trails on public lands on which the use of off-road vehicles may be permitted, and areas in which the use of off-road vehicles may not be permitted, and areas in which the use of off-road vehicles may not be permitted, ...." Id. at § 3. The Executive Order required that the regulations direct that the designation of such areas and trails: (1) "be based upon the protection of the resources of the public lands, promotion of the safety of all users of those lands, and minimization of conflicts among the various uses of those lands"; and (2) be located in such a way as to (a) "minimize damage to soil, watershed, vegetation, or other resources of the public lands"; (b) "minimize harassment of wildlife or significant disruption of wildlife habitats"; (c) "minimize conflicts

between off-road vehicle use and other existing or proposed recreational uses of the same or neighboring public lands"; and (d) "ensure the compatibility of such uses with existing conditions in populated areas, taking into account noise and other factors." Id. at § 3(a). Further, such trails and areas were not to be located in designated Wilderness or Primitive Areas, and "shall be located in areas of the National Park system ... only if the respective agency head determines that off-road vehicle use in such locations will not adversely affect their natural, aesthetic, or scenic values." Id. Public participation in the promulgation of the regulations and designations of the areas and trails was required.  Id. at § 3(b).  The Executive Order also required the agencies to "monitor the effects" of ORV use on the public lands and "[o]n the basis of the information gathered, they shall from time to time amend or rescind designations of areas or other actions taken pursuant to this order as necessary to further the policy of this order." Id. § 8.

In 1977 President Jimmy Carter issued Executive Order No. 11,989, which strengthened Executive Order 11,644. Exec. Order 11,989, 42 Fed. Reg. 26959 (May 24, 1977). Executive Order 11,989 provides that notwithstanding the general provisions relating to the zones of ORV use, the agency head "shall ... immediately close" any area or route to ORVs whenever he determines that ORV use "will cause or is causing considerable adverse effects" to soil, vegetation, wildlife, wildlife habitat, or cultural or historic resources.  Id. § 2 (amending Exec. Order 11,644, § 9(a)). The closure must remain in place until the adverse effects have been eliminated and measures have been implemented to prevent future recurrence. Id. at § 2(a). Additionally, each agency head was authorized to "adopt the policy that portions of the public lands within his jurisdiction shall be closed to use by off-road vehicles except those areas or

trails which are suitable and specifically designated as open to such use pursuant to Section 3 of this Order." Id. at § 2(b).

As contemplated by Executive Order 11,644, NPS issued a regulation at 36 C.F.R. § 4.10, which prohibits operation of motor vehicles except on park roads, parking areas, and "routes and areas designated for [ORV] use." 36 C.F.R. § 4.10(a). It also requires that such "routes and areas designated for [ORV] use be promulgated as special regulations." 36 C.F.R. § 4.10(b). Pursuant to this general regulation, NPS has promulgated special ORV regulations for the Original Preserve which, among other things, regulate where within the Original Preserve ORV use is permitted. See, e.g, 36 C.F.R. § 7.86(a)(2). In accord with the Executive Orders and 36 C.F.R. § 4.10, NPS will draft and promulgate ORV management regulations for the Addition prior to designating ORV trails in the Addition and opening any such trails to recreational ORV use. The Federal Defendants represent that, at present, no draft regulation has been noticed. (Doc. #107, p. 6).

### D. Endangered Species Act

Shortly after President Nixon issued this Executive Order, Congress enacted the Endangered Species Act of 1973, 16 U.S.C. § 1531-1544, described as "the most comprehensive legislation for the preservation of endangered species ever enacted by any nation." Tenn. Valley Auth. v. Hill, 437 U.S. 153, 180, 98 S.Ct. 2279, 57 L.Ed.2d 117 (1978). The U.S. Fish and Wildlife Service ("FWS") is the agency responsible for implementing the ESA. The purpose of the ESA is "to provide a means whereby the ecosystems upon which endangered species and threatened species depend may be conserved" and "to provide a program for the conservation of such endangered species and threatened species." 16 U.S.C. § 1531(b). "The plain intent of Congress in enacting this statute was to halt and reverse the trend toward species extinction,

whatever the cost." Tenn. Valley Auth., 437 U.S. at 184, 98 S.Ct. 2279.  The "negative environmental consequences" of ORV use, S. Utah Wilderness Alliance, 542 U.S. at 60, 124 S.Ct. 2373, potentially impacts endangered and threatened species of animals.

### E. Big Cypress Establishment Act and the Addition Act

Against this background, in 1974 Congress established the Big Cypress National Preserve ("the Preserve") to "assure the preservation, conservation, and protection of the natural, scenic, hydrologic, floral and faunal, and recreational values of the Big Cypress watershed in the State of Florida and to provide for enhancement and enjoyment thereof." Pub. L. 93–440, § 1, 88 Stat. 1258 (Oct. 11, 1974), codified at 16 U.S.C. § 698f(a). The Secretary of the Interior ("the Secretary") was authorized to acquire property within the Preserve, 16 U.S.C. § 698f(c), and required to administer the Preserve as a unit of the National Park System "in a manner which will assure their natural and ecological integrity in perpetuity in accordance with the provisions of sections 698f to 698m-4 of this title and with the provisions of sections 1, 2, 3, and 4 of this title, as amended and supplemented." 16 U.S.C. § 698i(a).  The original Preserve was estimated at 582,000 acres.  A.R. 12805.  Approximately 147,000 acres were added in 1988 as the Big Cypress National Preserve Addition ("Addition" or "Addition Lands") with the passage of the Big Cypress National Preserve Addition Act, PL 100–301; 74 Fed. Reg. 34030; 16 U.S.C. § 698m–1; A.R. 12803.[4]

The Secretary was required to develop and publish "such rules and regulations as he deems necessary and appropriate to limit or control the use of Federal lands and waters with respect to: (1) motorized vehicles, ... (6) hunting, fishing, and trapping, ..." 16 U.S.C. § 698i(b). On the other hand, the Secretary was also required to "permit hunting, fishing and trapping on lands and waters under his jurisdiction within the Preserve and Addition in accordance with the

---

[4] NPS began to administer the Addition in 1996.  A.R. 12805.

applicable laws of the United States and the State of Florida, except that he may designate zones where and periods when no hunting, fishing, trapping or entry may be permitted for reasons of public safety, administration, floral and faunal protection and management, or public use and enjoyment." 16 U.S.C. § 698j. The legislative history of the Act made clear Congress' expectations that ORVs would be allowed in the Preserve, but restricted to designated trails. <u>See</u> S. Rep. 93–1128 (Aug. 22, 1974), 1974 U.S.C.C.A.N. 5568, 5571; H.R. Rep. 93–502 at 5–6, 93rd Cong., 1st Sess. (Sept. 13, 1973). The same is true of the Addition Act. <u>See</u> H.R. Rep. No. 99-692, at 5 (1986); H.R. Rep. No. 100-30 at 3 (1987). The Addition Act further requires NPS to "cooperate with the State of Florida to establish recreational access points and roads, rest and recreation areas, wildlife protection, hunting, fishing, frogging, and other traditional recreational opportunities," and requires that three of these access points be located within the Preserve. 16 U.S.C. § 698m-2.

### F.  The Wilderness Act and Related NPS Management Policies

The Wilderness Act established the "National Wilderness Preservation System to be composed of federally owned areas designated by Congress as 'wilderness areas.'" 16 U.S.C. § 1131(a). The Wilderness Act defines the term "wilderness" as follows:

> A wilderness... is...an area where the earth and its community of life are untrammeled by man, where man himself is a visitor who does not remain... an area of undeveloped Federal land retaining its primeval character and influence, without permanent improvements or human habitation, which is protected and managed so as to preserve its natural conditions and which (1) generally appears to have been affected primarily by the forces of nature, with the imprint of man's work substantially unnoticeable; (2) has outstanding opportunities for solitude or a primitive and unconfined type of recreation; (3) has at least five thousand acres of land or is of sufficient size as to make practicable its preservation and use in an unimpaired condition; and (4) may also contain ecological, geological, or other features of scientific, educational, scenic, or historical value.

16 U.S.C. § 1131(c). The Wilderness Act, in pertinent part, required the Secretary of the Interior to "review every roadless area of five thousand contiguous acres or more" in the national park system and to "report to the President his recommendation as to the suitability or nonsuitability of each such area or island for preservation as wilderness." Id. § 1132(c). The enabling legislation for the Big Cypress National Preserve Addition, specifically Public Law 93-440 as amended by Public Law 100-301 states:

> …the Secretary shall review the area within the Preserve or the area within the Addition . . . and shall report to the President, in accordance with section 3(c) and (d) of the Wilderness Act (78 Stat. 891; 16 U.S.C. 1132(c) and (d)), his recommendations as to the suitability or nonsuitability of any area within the preserve or the area within the Addition . . . for preservation as wilderness, and any designation of any such areas as a wilderness shall be accompanied in accordance with said subsections of the Wilderness Act.

In addition, NPS has issued Management Policies, an internal guidance document, intended "to improve the internal management of [NPS]" by providing "NPS management and staff with clear and continuously updated information on NPS policy and required and/or recommended actions, as well as any other information that will help them manage parks and programs effectively." 2006 Management Policies, p. 4; River Runners for Wilderness v. Martin, 593 F.3d 1064, 1071 (9th Cir. 2010) (noting that the Management Policies make clear that they are "intended only to provide guidance within the Park Service"); Wilderness Soc'y v. Norton, 434 F.3d 584, 596-97 (D.C. Cir. 2006). Pursuant to NPS's 2006 Management Policies, NPS will undertake a wilderness eligibility assessment in order to determine whether the subject lands are eligible for protection as wilderness. A.R. 14410. Wilderness eligible lands are then formally assessed in a wilderness study in order to determine whether NPS should recommend to the NPS Director and ultimately the Department of Interior that these lands be designated as

wilderness.  Id.[5]   The Management Policies use Wilderness Act's definition of the term "wilderness" to identify the primary eligibility criteria under which NPS lands will be considered eligible for wilderness protection. A.R. 14409.   The Management Policies also articulate "additional considerations in determining eligibility" that should be taken into account in determining the wilderness eligibility of lands previously subjected to human use.  A.R. 14409-10.

Although, under the Wilderness Act, the President advises Congress of his recommendation as to wilderness designation, only Congress can designate wilderness. 16 U.S.C. § 1131(c).  The Wilderness Act prohibits any permanent or temporary roads, use of motor vehicles or motorized equipment, landing of aircraft, structures or installations within designated wilderness, "except as necessary to meet minimum requirements for the administration of the area for the purposes of [the Wilderness] Act." 16 U.S.C. § 1133(c).   Pursuant to the Management Policies, all wilderness eligible lands are "managed to preserve their eligibility for designation." A.R. 14412.

## II.  FACTUAL AND PROCEDURAL BACKGROUND

### A. The Original Preserve and the Addition

Big Cypress National Preserve is located in Southern Florida to the northwest of Everglades National Park. A.R. 12829.   Both the Preserve's topography and its ecology are distinctive to southern Florida, as the Preserve is characterized by exceptionally flat terrain and by "[e]xtensive prairies and marshes, forested swamps, and shallow sloughs." A.R. 9985, 12820, 12833, 12994. Approximately 90 percent of the Preserve is flooded during the wet season. A.R. 9985, 12828.   Due to the high level of annual rainfall and "the flat limestone topography... the

---

[5] The Addition Act specifically provides for review of the Addition Lands for preservation as wilderness.  16 U.S.C. § 6981.

inundation lasts for several months beyond the actual rainfall period" in the summer.  A.R. 9985, 12828.  This surface water hydrology is characterized as a "sheet flow" and, during the wet season, a "shallow continuous expanse of water," flows slowly, almost imperceptibly, toward the coasts.  A.R. 12994.  The amount of time that soils are saturated on an annual basis "is the major determinant of vegetative communities, and a difference of only a few inches in elevation... leads to the establishment of totally different plant communities."  A.R. 9985, 12828-31.

ORV use in the Original Preserve was governed by the 2000 Recreational Off-Road Vehicle Management Plan/Supplement to the Final Environmental Impact Statement.  65 Fed. Reg. 49593-01 (Aug. 14, 2000).[6]  This was a 200-plus page document which included an SEIS related specifically to ORV impact on the Preserve. A.R. 849-54. This Plan applied only to the original Preserve, A.R. 859, and did not address commercial operations of ORVs or ORV use in the Addition. A.R. 880.  Based upon legislative mandates and special commitments, NPS stated that "ORV use can occur only to the extent that it does not significantly adversely affect the preserve and its natural and cultural resources. Appropriate use of ORVs within this context, and the means for achieving that use, are provided in this plan."  A.R. 881. Due to its "scope and complexity," A.R. 880, NPS contemplated a three-phase implementation process with all aspects of the plan being implemented within ten years. A.R. 861, 880, 932, 936-40.

Under the 2000 ORV Management Plan, NPS would apply a "precautionary principle, which would favor resource protection over resource use" in its management of motorized recreational ORVs.  A.R. 859-60, 896, 898. The plan "emphasizes protection of natural and cultural resources in a manner that would leave the resources unimpaired for future users, while allowing ORV access for resource-related recreational opportunities." A.R. 896. Because NPS

---

[6] A background discussion of the 2000 ORV Management Plan for the Original Preserve is relevant because NPS relied on the terms of the 2000 Plan and lessons learned from it in drafting the Addition Lands ORV plan at issue in the instant case.

recognized its database of information was incomplete, "[w]here the effects of an action are unknown, the proposed management actions would favor the protection of the preserve's natural and cultural resources." A.R. 860.

NPS would also use an "adaptive management approach" to the 2000 Plan, which included continual review and modification of the plan as needed to ensure effectiveness and compliance with mandates and policies, A.R. 880, and "adaptive management techniques" which would "apply lessons learned from research and field experience to improving ORV management . . ." A.R. 896.  "This means that the plan would not be a static document but instead would evolve as additional information became available. Sources of information would include existing data, new information from scientific research and monitoring, and input from NPS staff and other individuals who are familiar with the preserve." A.R. 897. Management actions would be adapted that "assure the highest protection of the preserve's resources." A.R. 861. Any modifications to the plan would comply with all appropriate laws and regulations, including but not limited to, the NEPA and the ESA. A.R. 800, 880. Modifications to the plan would also include appropriate public involvement. Id.

In 1988, Congress authorized the acquisition of the Addition Lands to the Original Preserve and directed the Secretary of the Interior to permit recreational activities, including hunting, on these lands, just as these activities were permitted in the original Preserve.

> The Secretary shall permit hunting, fishing, and trapping on lands and waters under his jurisdiction within the preserve and the Addition in accordance with the applicable laws of the United States and the State of Florida, except that he may designate zones where and periods when no hunting, fishing, trapping, or entry may be permitted for reasons of public safety, administration, floral and faunal protection and management, or public use and enjoyment. 16 U.S.C. § 698j.

The Addition consists of two separate areas: the Northeast Addition and the Western Addition. A.R. 12828-29. The 128,000-acre Northeast Addition, located to the northeast of the

Original Preserve boundary, is bounded to the north and east by lands that are not federally managed, including the tribal lands and private lands. A.R. 12828, 12907. The Northeast Addition is bisected by Interstate 75 (also known as Alligator Alley or I-75) which is the main interstate access route between Fort Lauderdale/Miami and Tampa Bay. A.R. 13034, 13045, 16206. Noise disturbance created by I-75 "can be heard thousands of feet into the interior of the Addition." A.R. 13046. The Levee 28 Interceptor Canal runs through its northeast corner. A.R. 12833.

The 19,000-acre Western Addition is an approximately one-mile wide strip of land between State Road 29, a paved highway, and the western boundary of the Original Preserve. A.R. 13034. The Western Addition is crossed by two major highways, I-75 and U.S. 41 (also known as the Tamiami Trail) as well as by Wagonwheel Road. A.R. 12901, 13034. Roadside canals, byproducts of road construction, and line roadways exist in both areas of the Addition. A.R. 12991.

Prior to NPS's acquisition of the Addition Lands, they were either in private or state ownership. A.R. 12864, 9814.[7] Portions of the Addition Lands were used for agriculture, including farming and grazing, and they were altered and furrowed in furtherance of agricultural development. A.R. 13026-28, 9815, 7157-58. Mineral development also occurred, and remnants of that development remain, including seven abandoned well sites and a pipeline right of way that runs through the Northeast Addition. A.R. 9815, 13027, 13296. Hunting camps and ranches were constructed on these privately-owned properties, particularly in the section of the Northeast Addition north of I-75, which still contains a residential section commonly referred to as the Big Cypress Sanctuary. A.R. 16206, 9814-15.

---

[7] NPS has acquired the majority of the Addition (about 112,400 acres). The remaining land is owned by the Florida Department of Transportation, the Board of Trustees of the Internal Improvement Trust Fund, the Florida State School Board, and individual private owners. A.R. 8999, 9017, 12832.

The Addition contains approximately 244 miles of ORV trails, all of which were established and used prior to NPS's acquisition. A.R. 4087, 9015, 9815, 13259.  The existing network of ORV trails includes several raised grades, including Jones Grade, Nobles Grade, Bundschu Grade, and Bear Island Grade.  A.R. 3620, 9015, 16206.  Prior to NPS's acquisition of the Addition Lands, public hunting and ORV use occurred, A.R. 9815, and, although the Addition has been closed to public recreational ORV use and hunting since NPS began administering it in 1996, this trail network is still used by NPS and state agencies for administrative purposes including firefighting, research and monitoring, as well as use by individual property owners and tribal members. A.R. 12807, 12832, 7159-60.

### B.  NPS Management of the Original Preserve

NPS completed a wilderness study for the Original Preserve in 1979, which found no lands in the Original Preserve to be suitable for wilderness protection. A.R. 9695-9715, A.R. 10083-84.  As a result, there is no designated wilderness in the Original Preserve.

In 1991, NPS issued a General Management Plan and Final Environmental Impact Statement for the Original Preserve ("Original Preserve GMP")[8] which addressed all aspects of management of the Preserve, and called for the development of an ORV management plan.  A.R. 9946-10681.[9]  At that time, ORV use in the Preserve was largely unregulated and was characterized by dispersed use (meaning use not restricted to a designated trail system).[10]

---

[8] Each unit managed by NPS is required to have a general management plan.  A.R. 12827.  General management plans are intended to be long-term documents that establish and articulate a management philosophy and framework for decision-making and problem solving.

[9] In 1995, several environmental groups and individual plaintiffs filed suit regarding the use of recreational ORVs in the Preserve, which lawsuit resulted in a settlement agreement, pursuant to which NPS agreed to prepare the ORV management plan contemplated by the Original Preserve GMP.  See Fla. Biodiversity Project v. Kennedy, Case No. 95-50-CIV-TMS-24D (M.D. Fla.).

[10] In a 2001 lawsuit in which the Plaintiffs in this case intervened as defendants in support of the Original Preserve ORV Plan, this Court upheld the Plan, rejecting claims that it did not comply with NEPA. Wildlife Conservation

NPS published a "Final Recreational Off-Road Vehicle Management Plan" and Supplemental EIS ("Original Preserve ORV Plan") in August 2000, A.R. 13617-14235, and issued a ROD adopting its preferred alternative on September 28, 2000. 65 Fed. Reg. 70934 (Nov. 28, 2000). Pursuant to the Original Preserve ORV Plan, NPS restricted ORV access to 15 designated access points and no more than 400 miles of designated primary and secondary ORV trails, ultimately eliminating dispersed use of ORVs in the Original Preserve. A.R. 13620-21, 13664. NPS also instituted temporal closures of ORV trails, ORV permitting and licensing requirements, and a program to monitor the effects of ORV use. A.R. 13669-80.  NPS monitors compliance with the designated trail system, which it enforces through written warnings, citations, fines, and suspension of operator permits.  See e.g., A.R. 16379-82, 16585-89, 16506-13, 17527-30.

### C.  NPS Management of the Addition Lands

#### 1. The planning process for the Addition GMP/EIS

Because the Addition Lands were in private ownership at the time of the Original Preserve GMP, that document, by its own terms, addressed only the Original Preserve. Accordingly, it was necessary to draft a separate general management plan relating to the Addition Lands. 66 Fed. Reg. 31690 (June 12, 2001). The planning process for the Addition GMP/EIS began in 1999.  See A.R. 2072-74.  On June 12, 2001, NPS publicly noticed its intent to prepare a general management plan for the Addition that would not include either a wilderness study or an ORV management plan.  A.R. 13498; 66 Fed. Reg. 31690.[11]

---

Fund of Am. v. Norton, No. 2:01-cv-25-FtM-29DNF, Doc. #116 at 7 (Opinion and Order), Doc. #117 (Judgment) (M.D. Fla.).

[11] Although the Addition GMP/EIS covers numerous topics, including development of recreational access points and additional visitor facilities such as campgrounds in the Addition, the aspects that involve ORV management or wilderness are the focus of Plaintiffs' claims.

Even prior to releasing a draft for public comment, NPS involved the public in meetings and workshops to receive public comments on NPS's preliminary preferred alternative. See e.g., A.R. 13516-17 (describing public and agency involvement), 182-83, 580-85, 3204-05, 4778-92, 4975.  In response to public comments, NPS in 2006 expanded the scope of the GMP/EIS to include a wilderness study and an ORV management plan. A.R. 13516-17, 13498; 71 Fed. Reg. 23945 (Apr. 25, 2006). On July 11-12, 2006, NPS began the initial wilderness review by convening a workshop attended by both Preserve staff and representatives from other NPS offices. A.R. 13499.  The participants in that workshop used "geographic information systems, maps; aerial photographs, and personal knowledge," in order to identify wilderness eligible and ineligible lands.  A.R. 4051, 11893, 13499.  This assessment concluded that approximately 111,601 acres of the Addition were wilderness eligible, and identified certain areas for follow-up field visits. A.R. 13499, 4312-13.  That determination was a threshold step because a determination that an area is wilderness eligible (i.e., meets the objective criteria under the Wilderness Act) would require that the area not be opened to recreational ORV use until Congress had acted on any wilderness recommendation. NPS 2006 Management Policies, § 6.3.1, A.R. 14411.

NPS also developed a framework for developing a specific proposal for an ORV trail system for the Addition.  Under this framework, "NPS staff first mapped the locations of existing roads, trails, and other disturbed areas in the Addition," using "available maps, aerial photographs, and global positioning system equipment to locate roads and trails in the field" in order to identify potentially sustainable ORV trails. A.R. 11981. Field investigations were conducted in order to determine which of the existing ORV trails were sustainable. A.R. 11981, 14428-557, 14584-616.  Of the approximately 253 miles of trails assessed, 140 miles were

14

determined to be sustainable, meaning that they "can support currently planned and future uses with minimal impact to the natural systems of the area" with "negligible soil loss or movement" although some trail management, including stabilization of the trail, might be required. A.R. 11981. NPS then worked with stakeholders, including Plaintiffs, to identify potential modifications to the preliminary preferred alternative that might enhance public support. A.R. 4975-82.

### 2. The Draft GMP/EIS

NPS released its Draft General Management Plan/Wilderness Study/Off-Road Vehicle Management Plan/Environmental Impact Statement ("Draft GMP/EIS") for public comment on July 14, 2009. 74 Fed. Reg. 34030 (July 14, 2009), A.R. 11863-12284. The Draft GMP/EIS incorporated a draft wilderness study, A.R. 11993-98, and NPS's 2006 wilderness eligibility assessment, A.R. 12279-84, which was attached as an appendix. It also included an ORV management plan, modeled after the Original Preserve ORV Plan, whereby recreational ORV use in the Addition would be restricted to a designated trail system. A.R. 11973-92. It also included a "preferred alternative" that would "maximize ORV access." A.R. 11867.

A central feature of the Draft GMP/EIS was the concept of management zones which were used to "define[] specific resource conditions and visitor experiences to be achieved and maintained in each specific area of the Addition," and were incorporated into each of the alternatives considered, except for the "no action alternative." A.R. 11946. The four management zones discussed in the Draft GMP/EIS include: "developed," "frontcountry," "primitive backcountry," and "backcountry recreation." A.R. 11946-50. The developed management zone would include NPS administrative facilities, while frontcountry areas would include visitor facilities such as campgrounds, picnic areas, and comfort stations. A.R. 11948.

Recreational ORV use would be permitted only in the backcountry recreation management zone, where visitors would also be able to undertake any activities permitted in the other management zones. A.R. 11949. In contrast, no ORV use would be allowed in the primitive backcountry zone. A.R. 12252.  Here, the "[p]reservation of natural and cultural resources, restoration of degraded resources, and continuation of natural processes would be the dominant goals" and visitors there "would experience a natural landscape with opportunities for primitive and unconfined recreation directly dependent on ability, knowledge, and self-reliance." A.R. 11950.

The preferred alternative in the Draft GMP/EIS proposed approximately 140 miles of primary ORV trails located solely within the approximately 52,431 acres of land zoned for backcountry recreation. A.R. 11961-64.  A maximum of 700 ORV permits would be issued annually for the Addition, although the actual designation of trails and issuance of permits would be accomplished in phases.  Id.  Approximately 93,426 acres of land would be zoned as primitive backcountry in which recreational ORV use would be prohibited. A.R. 11962.  85,862 acres of land zoned as primitive backcountry would be proposed for wilderness designation.  Id.[12]

### 3. Public comments on the Draft Addition Lands GMP/EIS

NPS received extensive public comment on the Draft GMP/EIS, including testimony at four public meetings/wilderness hearings. The comments were fairly polarized.  See e.g., A.R.

---

[12] Even though the preferred alternative of the GMP/EIS for the Addition was ultimately adopted, the ORV management plan has yet to be implemented.  The Addition GMP/EIS expressly provides that implementation of the preferred alternative is dependent on available funding.  A.R. 12809, 12838 (noting that "[f]ull implementation of the approved plan could be many years in the future or may not occur if funding is not obtained"), 12888 (noting that "implementation of any alternative also depends on future funding and completion of appropriate environmental compliance").   NPS has consulted with the Florida Fish and Wildlife Conservation Commission, and it has expressed the opinion that the two agencies worked together to "develop and implement a successful approach to enforcement of ORV use in the [Original Preserve]" and noting that "[the Florida Fish and Wildlife Conservation Commission] is fully committed to providing law enforcement support and resources as needed to insure ORV use of designated trails in the Addition is enforced appropriately."   A.R. 13361.  The Florida Fish and Wildlife Conservation Commission also expressed that it was "highly confident of enforcement capabilities." A.R. 13361.

4364-67, 13254.  Many commenters, citing environmental concerns, voiced support for the alternative in the Draft GMP/EIS which would prohibit all recreational ORV use in the Addition and propose designation of the maximum amount of eligible wilderness.  See e.g., A.R. 4364-67.  Conversely, other commenters, including multiple state agencies, opposed any wilderness designation in the Addition.  See e.g., A.R. 6880-900.  Of those, most supported the alternative in the Draft GMP/EIS providing for the most ORV access.  See e.g., id.

Many of the comments received involved lands in the Western Addition and Northeast Addition north of I-75, that NPS's 2006 wilderness eligibility assessment had found wilderness eligible, but "which the commenters claimed actually included areas of noticeable human disturbance."  See e.g., A.R. 135499, 13353-55, 2484-86 (attaching map of ORV trails), 2858-59 (detailing "heavy historical" use of Addition Lands and manmade imprints such as "secondary roads" and "helispots").[13]  NPS also received comments objecting to lands found wilderness eligible on the grounds that "wilderness designation would severely restrict motorized access needed for emergency response, fire management, exotic species control, wildlife management, hydrologic restoration, and traditional activities such as hunting."  See e.g., A.R. 13549, 13353-59, 2862-63.[14]

On November 3-4, 2009, NPS held a "Finalize Preferred Alternative Workshop," where NPS staff met to discuss public and agency comments on the draft GMP/EIS and any potential

---

[13] Issues concerning wilderness eligibility of areas of the Addition were also raised by members of the public at the four wilderness hearings held by NPS as part of the wilderness study.  See e.g., A.R. 5458 (describing roads and effects of past agricultural use), 5538 (noting the existence of abandoned oil pads), 5794 (noting that the Addition Lands are "nowhere near pristine"); 5811 (noting agricultural furrows, rock pits, occupied homes, etc... in the Western Addition).

[14] In particular, the Florida Fish and Wildlife Conservation Commission questioned NPS's methodology in performing the wilderness eligibility assessment, in light of past disturbance of the Addition due to agricultural uses, logging, and oil exploration, in addition to the presence of exotic vegetation. A.R 13353-55. The Florida Fish and Wildlife Conservation Commission also expressed its concern that a wilderness designation could hinder NPS's ability to control wildfires or to combat the threat posed by invasive exotic species. A.R. 13356-58.  The Florida Department of Environmental Protection recommended a non-wilderness buffer around I-75 and the L-28 Interceptor Canal in order to accommodate future infrastructure maintenance. A.R. 13343.

changes to the preferred alternative. A.R. 6486-97, 13500.  At this meeting, NPS staff recommended that "the amount of proposed wilderness in the preferred alternative be reduced by eliminating all proposed wilderness in the Northeast Addition north of I-75, primarily because much of this area has been altered by previous agricultural practices." A.R. 13500, 6487-91. The group noted that NPS "will need to use mechanized equipment to remove exotic vegetation and maintain natural conditions through prescribed fire" in order to complete the process of restoring these lands to their pre-disturbance conditions, a process which might take years to complete. A.R. 13500, 6489-90.  The group found that the lands north of I-75 also include many uplands and pinelands which are more prone to incursion by exotic species and wildfires, requiring frequent administrative access to address these problems, as well as for panther monitoring purposes. Id. The group concluded that the frequency of administrative access requiring exceptions to wilderness restrictions would defeat the purpose of wilderness in the area of the Northeast Addition north of I-75.  Id.  In contrast, lands in the Northeast Addition south of I-75 were retained as proposed wilderness as they "were not used in the past for farming and other human use as much as lands north of I-75" and present less of a risk of fire than the lands north of I-75. A.R. 13500, 6487-88.

All lands in the Western Addition were also removed from proposed wilderness, "primarily because a buffer strip of either 1/4 to 1/2 mile on the eastern edge of the State Road 29 right-of-way would be needed for access, management, and operations needs," and this buffer would render the remaining non-disturbed lands in the Western Addition too fragmented to manage as wilderness. A.R. 13500. As a result of this meeting, "the acreage of proposed wilderness for the preferred alternative was reduced from 85,862 to 48,130." Id.

NPS's Management Policies require eligible wilderness to be managed as designated wilderness, which includes the Wilderness Act's prohibition on the use of mechanical equipment (including ORVs) unless "necessary to meet minimum requirements for the administration of the area for the purposes of [the Wilderness] Act." See NPS Management Policies 2006 (A.R. 14394-418; A.R. 14412; 16 U.S.C. § 1133(c). A waiver of this policy was sought with respect to certain areas of the Addition that had previously been found wilderness eligible under the 2006 assessment, but which NPS determined should not be proposed for wilderness designation as substantive questions had been raised as to whether certain areas of the Addition were indeed wilderness eligible or whether they contained areas of substantially noticeable human disturbance. A.R. 6923-25, 6934. As Preserve Superintendent Pedro Ramos explained, the waiver was necessary because these lands would "require our indefinite and continued active intervention in order to accomplish and maintain restoration goals related to exotic species of animals and plants as well as hydrology." A.R. 6934; see also 6923-25.

No waiver was issued. Therefore, in response to public comments received during the Fall of 2009 to the 2006 wilderness study, which was attached as an appendix to the Draft GMP/EIS, NPS convened an additional workshop, on February 17, 2010, in order to review the 2006 wilderness eligibility assessment as required by NPS Management Policy 6.2.1. A.R. 14409; 13500. NPS staff reviewed the wilderness criteria from the Wilderness Act and the Management Policies, and utilized the following assumptions:

> 1. The participants' definition of what was considered an example of a "substantial imprint of humans' work" included roads, trails, or other areas that were created by man and used significantly over time that would require substantial human intervention to restore.
>
> 2. Whether the imprint of humans' work is substantially unnoticeable was reviewed from the perspective of a land manager and not a common visitor. Man's past work is, in many cases, substantially noticeable to a land manager,

but may not be to the common visitor.

3. The wilderness eligibility criteria were only applied to the Addition; areas in the original Preserve were not included as part of this analysis.

4. If needed restoration techniques would be inconsistent with wilderness eligibility, then the 2006 wilderness eligibility assessment would be altered as appropriate.

A.R. 7156, 13293.

NPS then conducted an assessment of the Addition Lands which the Defendants assert was more detailed than had been done in 2006, using topographic maps, up-to-date geographic information system overlays, and aerial photography from both 1999 and 2009, as well as personal knowledge.  Compare A.R. 4092-96 with A.R. 7155-64.  Representatives from NPS offices, many of whom had been involved in the 2006 assessment, reevaluated previously disturbed areas of the Addition, including established ORV trails and former agricultural areas, for wilderness eligibility.  A.R. 7156-57, 13501.[15]

Based on the data reviewed, NPS found – as memorialized in a report of the February 17, 2010 Wilderness Workshop (A.R. 7155-7164) – that certain identified disturbed areas did not meet the wilderness eligibility criteria, and that once those areas were removed from wilderness eligibility, the surrounding areas were fragmented and not practicable to manage as wilderness. A.R. 7157-63.[16]  NPS also found that the non-wilderness buffers surrounding the L-28 Interceptor Canal, highways, and active ORV trails in the 2006 assessment were "too narrow to

---

[15] As discussed more fully below, see III.A. infra, Plaintiffs argue that even though the waiver request was denied, NPS instead opted to achieve the same objective through a different means by undertaking a "re-assessment of wilderness eligibility" to reduce what had previously found to be eligible wilderness.  A.R. 15423.  Plaintiffs assert that to accomplish that objective, despite concerns about "optics and public perception," A.R. 7092-93, NPS set about the job of "adjust[ing] the assumptions" on which the 2006 eligibility determination had been made.  A.R. 7155. After the workshop held on February 17, 2010, id., new "assumptions" were developed and ways were found to reduce eligibility from 111,601 to 71,263 acres — a loss of over 40,000 acres. A.R. 7313.

[16] The findings from this Workshop are detailed in Appendix B to the Final GMP/EIS.  See A.R. 13291-304.

offer opportunities for solitude or primitive recreation," and that these buffers should be increased to 1/4 mile in order to remedy this error. A.R. 7159-63, 13301.  As a result, NPS recommended that 71,263 acres[17] of the Addition were eligible for designation as wilderness at the conclusion of the February 17, 2010 Wilderness Workshop (down from 85,862 acres in the Draft GMP/EIS).  A.R. 7163.  This recommendation was presented to and approved by the NPS Director Jonathan Jarvis, and included in the Final GMP/EIS.  A.R. 12942, 12939-43, 13291.  A wilderness designation is important because if an area is designated as "wilderness" no ORV use can occur in that area.  See 16 U.S.C. § 1133(c) (under the Wilderness Act, any "use of motor vehicles, motorized equipment or motorboats, ... landing of aircraft, ... [or] other form of mechanical transport" is prohibited).  Once designated as eligible, pursuant to the Management Policies, the lands are "managed to preserve their eligibility for designation."  A.R. 14412.

### 4. The Addition GMP/EIS

On November 24, 2010, NPS noticed the availability of the final GMP/EIS for the Addition Lands in the *Federal Register*, informing the public that the document was available for review.  75 Fed. Reg. 71730 (Nov. 24, 2010); A.R. 8688.  The Addition GMP/EIS included a revised wilderness eligibility assessment which, pursuant to the February 17, 2010 workshop, found 71,263 acres of the Addition Lands eligible for wilderness protection, and a wilderness study. A.R. 12939-43, 13291-13304. The GMP/EIS retained the requirement that all ORV use be restricted to designated trails, although, as a result of additional field investigations conducted in response to comments on the Draft GMP/EIS reflecting the environmental concerns regarding impacts on the ORV trail system, NPS reduced its assessment of the mileage of sustainable ORV

---

[17] While the summary of findings in the Final GMP/EIS indicate that the wilderness study identified *71,260* acres as wilderness eligible and cites to Appendix B, the April 2010 Wilderness Eligibility Assessment indicates that *71,263* acres met the wilderness eligibility criteria. Compare A.R. 12942 with 13291.  The Court will use the amount indicated in the April 2010 Wilderness Eligibility Assessment (71,263).

trails in the Addition. A.R. 13257, 13514.  The management zones from the Draft GMP/EIS were also retained in the Addition GMP/EIS. A.R. 12889.

With respect to ORV management, the GMP/EIS authorized the use of swamp buggies and all-terrain cycles, A.R. 12924, and incorporated many of the features of the Original Preserve ORV Plan, including restricting ORV use to a designated trail system, nightly and seasonal closures of the ORV trails, discretionary trail closures in the interest of safety and resource protection, and an ORV inspection program.  Compare A.R. 13619-21 with A.R. 12925, 12928-31.  The preferred alternative included approximately 130 miles of trails as of a conceptual primary trail network, although the actual designation of trails would be accomplished in phases based on field conditions, proximity to access points, levels of trail stabilization necessary and trail monitoring results.  A.R. 12904-05.  The ORV trail system would be phased in over time and, after an initial designation of trails based on field conditions, additional trails would be designated if monitoring indicated that "impacts were at or below acceptable limits." A.R. 12905. Any ORV trails not designated for public ORV use under the preferred alternative "would be reclaimed (natural elevations and plant communities restored) as funding permits." A.R. 13257.

The Addition GMP/EIS provides for adaptive management[18] of the Addition and identifies several "user capacity indicators and standards" intended to guide this adaptive

---

[18] Plaintiffs argue in their Reply Brief (Doc. #114) that NPS's adaptive management plan (see A.R. 12923) is not a substitute for appropriate scientific studies and is in any event too amorphous.  They assert that whatever the deficiencies in NPS's failure to obtain essential studies and whatever shortfalls there are in the support in the record for NPS's conclusions, the Court should not allow NPS to address the problems that will certainly arise from the ORV plan in the Addition through trial and error after the resources have been impacted or degraded.  Plaintiffs assert that while adaptive management is a recognized tool for federal agencies in appropriate cases, that tool may not be used as a substitute for performing studies that could be performed and otherwise complying with NEPA. Were adaptive management a substitute for performing studies that could be performed, NEPA's requirements would be eviscerated. Any agency could simply jump ahead of NEPA's pre-action procedural requirements and state it would figure out the action's environmental consequences after the fact with adaptive management.

management and to provide qualitative standards for measuring any adverse impacts to Addition resources, including impacts on wildlife, surface water flow, water quality, soil conditions, vegetation, and visitor experience.  A.R. 12917-22.  It also discusses specific management strategies that NPS would use to reduce or mitigate any adverse impacts, including management strategies directed at recreational ORV use.  A.R. 12921-38.  With respect to ORV use, if NPS's monitoring indicated that an applicable standard had been exceeded, NPS would then implement adaptive management actions including, but not limited to, closures of trails, trail relocation, trail maintenance, or alteration of the level or type of use on a trail.  A.R. 12932-33.

Although the Addition GMP/EIS contemplates that hunting will eventually be allowed in the Addition, it provides that before the Addition is opened for hunting NPS "would develop a hunting management plan that would follow NEPA compliance requirements," and would assess "the effects of hunting activities on special status species such as the Florida panther."  A.R. 13253, 13261.  In developing the hunting management plan, NPS would engage in additional consultation with FWS pursuant to Section 7 of the ESA, and would work closely with the Florida Fish and Wildlife Conservation Commission, pursuant to 16 U.S.C. § 698m-2. A.R. 13253. Similarly, NPS would engage in additional consultation with FWS before any access facilities are built and obtain any necessary permits for construction in wetlands. A.R. 13252-53.

Plaintiffs argue that NPS finalized the GMP to meet an artificial deadline it has imposed on itself and did so despite the absence of numerous critical studies, including:

> **(a) The absence of a completed FWS BO when NPS finalized its GMP.** NPS had pressed for that opinion earlier. A.R. 7454-56, 15493-96, 15592. Its principal author, Jane Tutton, explained that was not possible because she had been "heavily involved in the Deepwater Horizon spill response." A.R. 7454-56. NPS

---

To the extent the issue of adaptive management is raised with respect to specific areas of the general management plan raised by Plaintiff, the Court has considered the use of adaptive management in those areas and the recommendations incorporate such considerations.

continued to push, however, A.R. 7538-41, and she stated that "timing will be tight on this," A.R. 15518. The opinion was not finalized until November 18, 2010, one week before the release of the GMP. A.R. 13531, 15866.

**(b) The absence of a study of ORV impacts on the endangered Florida panther**. The Preserve had sought funding for such a study but NPS had found that study of lower priority for limited available funding than other studies proposed by other National Park System parks. A.R. 15504-07.

**(c) The absence even of an up-to-date analysis of panther movements based on ORV presence**. Failing to obtain funding for a study of ORV impacts on the panther, the Preserve contracted for a statistician to re-analyze and update 1999 data showing that panthers tended to stay away from areas where ORVs were used. A.R. 16249. But by the time NPS finalized its GMP, it still did not have the new report. A.R. 8882 (draft submitted months after GMP and FWS opinion). FWS's Tutton expressed her concern, saying, "[w]e are a little vulnerable in not getting that info before we put the Final EIS and BO out there." A.R. 15559.

**(d) The absence of any study of the impact of the preferred alternative on the critical surface water flows through the Addition or its water quality**. NPS performed no study of that issue. Instead, the GMP simply stated that the impact was "unknown." A.R. 12997.

**(e) The absence of any study of the impact of the preferred alternative on the natural soundscape of the Addition**. Natural sounds are an important part of the Addition's resources, for non-motorized users and for wildlife. But after obtaining a "base-line" study of such sounds, A.R. 14899, no further work on that issue was done. Nevertheless, NPS found ORV impacts on other users only "minor to moderate," with no separate evaluation of noise impacts.

**(f) The absence of any plan to obtain the funding needed to monitor, implement and/or enforce the plan**. NPS relies on the designated ORV trail restrictions and other limitations imposed by the 2000 Plan to mitigate ORV impacts. But — because of lack of funding and manpower and because of the vast area involved — NPS has not adequately monitored the Original Preserve, as FWS repeatedly urged, A.R. 13321, 13322, 13315, to assess whether ORV users are going off-trail there or otherwise to determine if those restrictions have been effective in minimizing impacts. NPS concedes it will need a 20% increase in its staff to monitor and enforce the new Addition plan, A.R. 12909, but provides no evaluation of impacts in the absence of such an increase.

### 5. The Biological Opinion

On November 18, 2010, FWS issued its BO for the Final GMP/EIS. A.R. 8583. In its

BO, FWS concurred with the NPS's determinations that the proposed action was not likely to

adversely affect the red-cockaded woodpecker, the West Indian manatee, the wood stork, the Everglades snail kite, the American Crocodile, and the Eastern Indigo snake. A.R. 8592-94.  As to the snake, FWS concluded that activities with the potential to affect the snake were the construction of new access points or recreational facilities and the use of ORV trails. A.R. 8593. Construction of new access points or recreational facilities would likely require permits from the U.S. Army Corps of Engineers, and therefore result in additional, project-specific ESA consultation in the future.  Id.  In light of the minimization and mitigation measures proposed by NPS, it concluded that any change in territory size or configuration resulting from ORV use would not result in measurable changes in feeding breeding, or sheltering behaviors of the Eastern Indigo snake.

FWS also concluded that the proposed action was not likely to jeopardize the Florida panther. A.R. 8630. In support of this conclusion, the BO cited available information concerning the effects of ORV use on panthers in other areas of the Preserve. This information included a 2002 study by Janis and Clark, A.R. 16249 & 14375, and a 2010 draft study by Fletcher and McCarthy, A.R. 7908. Both studies observed that panthers moved away from trails during the hunting season.  See A.R. 8627. However, based on these studies, FWS concluded that the observed movement away from trails has "minor biological consequences."  Id.

FWS authorized "incidental take" of Florida panthers in the form of harassment in the accompanying Incidental Take Statement ("ITS").  A.R. 8631.  No lethal take was anticipated or authorized.  See id.  The ITS also specified terms and conditions in order to be exempt from the prohibitions of Section 9 of the ESA. A.R. 8632. The terms and conditions called for NPS to: (1) minimize human disturbance and habitat degradation; (2) minimize take through a better understanding of the interactions of the Florida panther and its environment in the Addition

Lands; and (3) notify FWS upon locating a dead, injured, or sick threatened or endangered species. Id. at 8632-33.

### 6. The Record of Decision

On February 4, 2011 — twelve years after NPS initiated the planning process for the Addition GMP/EIS — NPS signed a ROD formally adopting the preferred alternative in the Addition GMP/EIS.  A.R. 13494-96; 76 Fed. Reg. 29786, 2011 WL 1933679 (May 23, 2011). The ROD explained that NPS convened the February 17, 2010 wilderness eligibility workshop to review the "2006 assessment and pertinent public comments to the draft GMP/EIS in order to decide what changes if any should be made to the 2006 assessment."  A.R. 13500.  The ROD also explained that, in 2010, NPS concluded that some of the areas initially found to be wilderness eligible in 2006 were, in fact, wilderness ineligible, primarily due to:

- Substantial evidence of past substantial agricultural disturbance, *e.g.*, in the Western Addition between I-75 and U.S. 41 and in the Northeast Addition west of Nobles Ranch.

- A 1/4-mile buffer on either side of roads, trails, and canals due to lack of opportunities for solitude and the presence of human disturbance. The lands adjacent to these features also frequently contain excavated areas and sidecast debris from construction and maintenance, as well as other artifacts.

- Fragmentation as a result of the two items previously described.  A.R. 13501.

The ROD includes a discussion of measures that NPS would apply "to avoid or minimize potential impacts from implementation of the selected action" to Addition resources, including air, water, soils, vegetation, wildlife (including threatened and endangered species and species of concern), cultural resources and visitor safety and experience.  A.R. 13503-13.  In an effort to comply with the Organic Act, NPS also issued impairment findings and concluded that:

Adverse impacts anticipated as a result of implementation of the NPS preferred alternative on a resource or value whose conservation is (1) necessary to fulfill specific purposes identified in the establishing legislation, (2) key to the natural or cultural

integrity of the Preserve (including the Addition) or to opportunities for enjoyment of the Preserve, or (3) identified as significant in the Preserve's general management plan or other relevant NPS planning documents will not rise to levels that would constitute impairment.

A.R. 13608.

## III. DISCUSSION[19]

### A. Count One: APA Violations of the Wilderness Act

Count One alleges that the NPS violated the APA by acting arbitrarily and capriciously by manipulating the Act's criteria and standards for determining what areas are eligible for protection as "wilderness" under the Wilderness Act.  Plaintiffs argue that instead of objectively applying the Act's requirements, NPS figured out what criteria would permit it to minimize "wilderness" eligibility to meet political demands for greater ORV use and then crafted and applied "assumptions" about such criteria to satisfy that objective.  But that those "assumptions" are inconsistent with the Act, and that process and the resulting determinations are arbitrary and capricious.

The acreage designated as wilderness in the ROD for the Addition Lands was 71,263. A.R. 13293.  Congress defined "wilderness" as an area, "in contrast with those areas where man and his own works dominate the landscape," "where the earth and its community of life are untrammeled by man, where man himself is a visitor who does not remain" and where "imprint of man's work substantially unnoticed."   16 U.S.C. § 1131(c).   In the Act, Congress further defined an objective set of criteria by which federal agencies must assess eligibility of public lands as to potential long-term wilderness preservation, *i.e.*, the area

(i) generally appears to have been affected primarily by the forces of nature, with the imprint of man's work substantially unnoticeable;

---

[19] Each of the Defendant-Intervenors adopted the arguments of the Federal Defendants in their respective motions for summary judgment.  Therefore, the Court will simply refer to the arguments as those made by the "Defendants."

(ii) has outstanding opportunities for solitude or a primitive and unconfined type of recreation;

(iii) has at least five thousand acres of land or is of sufficient size as to make practicable its preservation and use in an unimpaired condition; and

(iv) may also contain ecological, geological, or other features of scientific, educational, scenic, or historical value.

Id.

In its wilderness assessment, Plaintiffs argue that NPS reassessed its prior 2006 wilderness eligibility determination of the Addition Lands to satisfy political pressure. To substantiate this, Plaintiff points to the fact that in 2002, then-Superintendent John Donahue provided the Regional Director with a "wilderness suitability assessment" that included "determinations" that 128,597 acres of the Addition (approximately 87%) satisfied the wilderness eligibility criteria of the Wilderness Act. A.R. 3463-65. And that one month later, the Regional Director decided without explanation to exclude Superintendent Donahue's wilderness assessment from the GMP process. See A.R. 3484. Then, in February 2006, NPS decided to revisit the wilderness eligibility assessment process. A.R. 3939, 3983. Thus, in 2006, NPS convened a two-day workshop involving nearly twenty NPS officials, see A.R. 4055, during which those land managers resolved how the statutory criteria must be applied in the Addition and then applied the criteria to each parcel of land in the Addition to determine eligibility. See A.R. 4047-55. NPS then followed that workshop with "site visits" and "field inspections" to ensure that the areas deemed eligible during the workshop in fact satisfied the statutory criteria on the ground. See, e.g., A.R. 4056-67 & 4131-33, 4341-42 (describing "site visits"), 4346 (discussing "field inspections"), 14428-557, 14584-616.

In April 2007, NPS publicly announced that its 2006 eligibility assessment had determined that approximately 109,000 acres (74% of the Addition) satisfied the Wilderness Act eligibility criteria. A.R. 4510. In late 2007, NPS added an area of 2,600 acres, known as "The Gap," that had been inadvertently eliminated from wilderness eligibility, see A.R. 4816, 4820, resulting in a final aggregate of 111,601 acres (76% of the Addition) that satisfied the statutory criteria.

In May 2009, NPS issued its Draft GMP/EIS for the Addition Lands. A.R. 11863. NPS described the 2006-2007 work and stated that that eligibility assessment identified 111,601 acres as meeting the wilderness criteria and being eligible for wilderness designation. A.R. 11995-96. NPS also included as an attachment an appendix containing a detailed wilderness eligibility assessment of the Addition based on that work. See A.R. 12279-84. NPS's preferred alternative in the Draft GMP/EIS issued in May 2009 proposed 85,862 acres for wilderness designation. A.R. 11962.

In response to public comment received during the Fall of 2009 concerning the wilderness eligibility assessment in the Draft GMP/EIS, NPS convened an additional workshop on February 17, 2010, in order to review the 2006 wilderness eligibility assessment again. A.R. 13500. In April 2010, NPS finalized the reassessment, A.R. 7312-23, which was first disclosed to the public in the Final GMP/EIS issued in November 2010, which recommended 71,263 as wilderness eligible. A.R. 12837, 13291-304.

Plaintiffs argue and point to information indicating that an overwhelming majority of commenters supported an alternative proposing substantial wilderness, A.R. 6739-43, 11966-67, but that a few comments from politicians, ORV users, state agencies and local governmental critics requested that NPS recommend significantly less acreage to Congress for wilderness

designation, although not contesting the eligibility determination. See, e.g., A.R. 1026 (FFWCC "adamantly oppos[ing]" the designation of 85,862 of wilderness in the Addition). Plaintiffs go on to argue that NPS decided to adjust the assumptions upon which the 2006 eligibility determinations had been made in order to decrease the amount of wilderness eligible in the Addition to allow more recreational ORV use. Citing A.R. 7155. What the agenda for the February 2009 wilderness workshop indicates is that the group was meeting in part to "discuss the need to adjust the assumptions based on comments received," as well as to "review 2006 wilderness eligibility assessment and assumptions used to interpret wilderness criteria." Id.

Plaintiffs essentially argue that the "assumptions" applied by the NPS in its February 2010 wilderness eligibility determinations which were ultimately incorporated into the Final GMP/EIS are inconsistent with the Wilderness Act without explanation, and that the process and the resulting determinations are arbitrary and capricious, violating the Administrative Procedures Act. As examples, Plaintiffs point to Areas 3, 5, 6, 22, 23, 29, 31, and 34, and are requesting relief as to these Areas in the Addition Lands.[20] Further, Plaintiffs challenge NPS's assumption that Addition areas of fewer than 5,000 acres should be excluded from wilderness designation even if these areas were contiguous to Original Preserve areas that could be eligible and Plaintiffs challenge the fact that NPS expanded corridor widths to exclude significant areas from eligibility as wilderness. These Areas were found eligible as wilderness in 2006, but disqualified in 2010.

Plaintiffs further argue that NPS did not explain why it was necessary or appropriate to deviate from its own 2006 application of the criteria or from its own policies and guidelines that expressly contemplate wilderness eligibility for lands containing unimproved trails. See NPS

---

[20] Plaintiffs mentioned Area 29 in their opening brief but decided not to pursue relief within respect to that Area in their reply brief and Area 28 is not mentioned in Plaintiffs' opposition and reply brief.

Policies, §§ 6.2.1.2, A.R. 14409; 6.3.10.1, A.R. 14415 ("Where abandoned roads have been included within wilderness, they may be used as trails [or] restored to natural conditions."); 6.3.10.2, A.R. 14415 (allowing trails in wilderness as "necessary for resource protection and/or for providing for visitor use for the purposes of wilderness"). See also A.R. 4103 ("The built environment includ[es] elevated roads and trails that required significant engineering or manipulation of the natural environment. In most cases, ORV trails do not meet this criterion. Therefore, areas containing ORV trails may be considered suitable for wilderness."). Defendants' justification for the change in wilderness designation from 2006 to 2010 was that other information was available to NPS staff at the February 2010 wilderness workshop that had been unavailable at the 2006 workshop. Compare A.R. 4092-96 with A.R. 7155-64. In 2010, NPS had the benefit of an additional four years of experience managing the Addition, including experience managing infestations of invasive exotic species.  See, e.g., A.R. 7158-59 (noting that mechanized equipment was used to manage a Brazilian pepper infestation). NPS also utilized more recent aerial photography and geographic information system overlays.  A.R. 7157 (noting that staff reviewed aerial photographs from 2009). Moreover, participants had the benefit of information discussed at the "Finalize Preferred Alternative Workshop," held on November 3-4, 2009, wherein NPS staff discussed public and agency comments to the Draft GMP/EIS, and specifically considered NPS's need to use mechanized equipment to restore disturbed lands and remove invasive exotic vegetation in areas of the Addition previously found to be wilderness eligible. A.R. 13500, 6487-91.[21]   Defendants argue that the participants at the February 2010

---

[21] Although the November 2009 workshop did not discuss wilderness eligibility, many of the concerns raised there were highly relevant to wilderness eligibility and were properly addressed in the subsequent February 2010 workshop, including discussion of the need for the creation of quarter-mile to a half-mile buffer zone of non-wilderness lands adjacent to I-75 and State Road 29 "to facilitate access for fire and land management needs as well as maintenance needs."  A.R. 6487-91.

wilderness workshop conducted a more detailed review of disturbed areas of the Addition which is evident from the workshop notes and the 2010 wilderness eligibility assessment itself, both of which describe disturbed areas in greater detail than the 2006 assessment. Compare A.R. 4092-96, 12279-84 with A.R. 7155-64, 13291-304.[22]

The Draft GMP/EIS, which was released for public comment in 2009, included NPS's 2006 wilderness eligibility assessment as Appendix B. A.R. 12279-84. Even though many comments on the Draft GMP/EIS simply opposed the designation of any wilderness, many comments raised substantive questions as to whether certain areas of the Addition were indeed wilderness eligible or whether they contained areas of substantially noticeable human disturbance. See A.R. 135499, 13353-55, 2484-86. Only those comments "pertaining to wilderness eligibility" were reviewed at the February 2010 wilderness workshop. A.R. 7155. Thus, NPS reevaluated whether the Addition Lands should be proposed for wilderness, A.R. 6486-91, but also reasonably reexamined its earlier assessment of whether those lands were indeed wilderness eligible. A.R. 7155-64.

NPS has a substantive obligation under NEPA to address the comments that were made by individuals regarding the 2006 wilderness eligibility assessment. 40 CFR § 1503.4.[23] The Wilderness Act, in pertinent part, required the Secretary of the Interior to "review every roadless area of five thousand contiguous acres or more" in the national park system and to "report to the President his recommendation as to the suitability or nonsuitability of each such area or island for preservation as wilderness." 16 U.S.C. § 1132(c). Pursuant to NPS's 2006 Management

---

[22] For example, participants at the February 2010 wilderness workshop identified "an old property line that was bulldozed," "an old agricultural ditch," and a "pit [] visible on the east side of Nobles Grade." A.R. 7159.

[23] 1503.4 – Response to comments. (a) An agency preparing a final environmental impact statement shall assess and consider comments both individually and collectively, and shall respond by one or more means listed below, stating its responses in the final statement. Possible responses are to: (1) Modify alternatives including the proposed action; (2) Develop and evaluate alternatives not previously given serious consideration by the agency; (3) Supplement, improve, or modify its analyses; (4) Make factual corrections; (5) Explain why the comments do not warrant further agency response…

Policies, NPS will undertake a wilderness eligibility assessment in order to determine whether the subject lands are eligible for protection as wilderness. A.R. 14410. The Wilderness Act and the Addition Act specifically provide for review of the Addition Lands for preservation as wilderness by NPS. 16 U.S.C. §§ 1131, 698l. The Wilderness Act required the Secretary of the Interior to make recommendations to the President as to the suitability of existing national parks, refuges, and game ranges for preservation as wilderness. 16 U.S.C. § 1132(c). Upon recommendation of the President, only Congress is empowered to designate existing national park, wildlife refuge, and game range lands as wilderness. Id. Congress may also withdraw lands from designated wilderness after a similar process. 16 U.S.C. § 1132(e).

In this case, NPS has only recommended to the NPS Director that certain lands are eligible for wilderness designation in the Addition Lands. It is not clear from the Administrative Record whether the NPS Director then forwarded any of the findings and conclusions of the 2010 wilderness study to the Department of Interior for recommendation of wilderness protection to Congress. See NPS Management Policies 6.2.2; A.R. 14410 ("The Director's proposed wilderness will identify park lands that the Director believes the Secretary should recommend for immediate wilderness designation…"). But once land is designated as eligible, pursuant to the Management Policies, the lands are "managed to preserve their eligibility for designation." A.R. 14412. The eligible lands may then be formally studied to further develop the recommendation to Congress for wilderness designation. See NPS Management Policies 6.2.2; A.R. 14410.

Plaintiffs argue that NPS adopted and applied new "assumptions" in 2010 that imposed essentially a "pristine" condition requirement not found in the Wilderness Act, different from the eligibility requirements than they had imposed in the 2006 study wherein NPS was able to

exclude from eligibility several areas previously found eligible.  This, they argue, is inconsistent with the APA and reflect an arbitrary and capricious reversal of position without any explanation.   In response, Plaintiffs argue that the assessment criteria complied with the Wilderness Act and NPS Management Policies.  Although the Wilderness Act allows agencies to find non-pristine lands eligible as wilderness, it does not require agencies to find lands wilderness eligible if they have been trampled or if the "imprint of man's work" is noticeable. 16 U.S.C. § 1131(c).  Similarly, lands that require the use of "long-term restoration techniques [that] would be inconsistent with wilderness eligibility" do not "retain [their] primeval character and influence." See id.

In the 2006 wilderness eligibility assessment, for an area of land to be eligible for wilderness designation, it had to have the following characteristics:

-Generally appear to have been affected primarily by the forces of nature, with the imprint of man's work substantially unnoticeable;

-Be undeveloped and retain its primeval character and influence, without permanent improvements or human habitation;

-Be untrammeled by man, where man himself is a visitor who does not remain;

-Offer outstanding opportunities for solitude or primitive and unconfined type of recreation; and

-Be protected and managed so as to preserve its natural conditions.

A.R. 12941; 2006 NPS Management Policies 6.2.1.1.

Plaintiffs specifically take issue with the NPS's – or specifically the group of individuals that convened to conduct the 2010 wilderness eligibility assessment – interpretation of what an "imprint of man's work substantially unnoticed" under the Wilderness Act entails.[24]  The phrase

---

[24] The Wilderness Act defines wilderness in part as land that "generally appears to have been affected primarily by the forces of nature, with the imprint of man's work substantially unnoticeable."  16 U.S.C. § 1131(c)(1).

is not defined by Congress in the Wilderness Act.  This was included as a "point to consider" in the 2006 wilderness eligibility assessment, wherein the 2006 assessment noted: "The group's definition of what was considered an example of a 'substantial imprint of humans' work' included elevated roads and trails that required significant engineering."  A.R 4094.  The definition was slightly changed for the 2010 wilderness eligibility assessment, where the participants' "assumptions" included the group's definition of what was considered an example of "substantial imprint of humans' work" as land that included "roads, trails, or other areas that were created by man and used significantly over time that would require substantial human intervention to restore."  A.R. 13293.  In part, as a result of this, lands that were determined eligible for wilderness designation in 2006, were found ineligible in 2010.  The Draft GMP/EIS was not supplemented with the wilderness re-assessment and accordingly an additional EIS was not conducted on the wilderness re-assessment.[25]  The re-assessment was first disclosed to the public in the Final GMP issued in November 2010.[26]

---

[25] Even though the amount of acreage designated as wilderness eligible from the Preferred Alternative in the Draft GMP/EIS to the Final GMP/EIS decreased by 14,602 acres, the undersigned recommends that NPS was not required to supplement the EIS.  While NEPA itself does not directly address post-decision supplemental environmental impact statements, the Supreme Court has held that at times NEPA requires such supplementation. Marsh v. Or. Nat. Res. Council, 490 U.S. 360, 370-71 (1989); Norton v. Southern Utah Wilderness Alliance, 542 U.S. at 72-73.  "NEPA cases have generally required agencies to file environmental impact statements when the remaining governmental action would be environmentally 'significant.'" Marsh, 490 U.S. at 371, quoting TVA v. Hill, 437 U.S. 153, 188 n.34 (1978).  Thus, an agency can modify a proposed action in light of public comments received in response to a draft EIS.  40 C.F.R. § 1503.4(a).  "[A]gencies must have some flexibility to modify alternatives canvassed in the draft EIS to reflect public input."  California v. Block, 690 F.2d 753, 771 (9th Cir. 1982).  If the final action departs substantially from the alternatives described in the draft EIS, however, a supplemental draft EIS is required: "Agencies ... [s]hall prepare supplements to either draft or final environmental impact statements if ... [t]he agency makes substantial changes in the proposed action that are relevant to environmental concerns...." 40 C.F.R. § 1502.9(c).  An agency makes a "substantial change" to a proposed action if the change "presents a seriously different picture of the environmental impact" of the agency's action. In re Operation of Mo. River Sys. Litig., 516 F.3d 688, 693 (8th Cir. 2008); Ark. Wildlife Fed'n v. U.S. Army Corps of Eng'rs, 431 F.3d 1096, 1102 (8th Cir. 2005). On the other hand, a supplemental environmental statement is not required when a change is (a) simply a minor variation of an alternative previously discussed in an EIS, or (b) qualitatively within the spectrum of alternatives that were discussed in an EIS.  "Forty Most Asked Questions Concerning CEQ's National Environmental Policy Act Regulations," 46 Fed. Reg. 18,026, 18,035 (Mar. 23, 1981).

    In this case, the total acreage that was designated as wilderness eligible in the Final GMP/EIS was 71,263, which was qualitatively within the spectrum of alternatives found in the DEIS, as the land proposed for wilderness designation in Alternative B was 48,919. A.R. 12011.  See In re Operation of Mo. River Sys. Litig., 516 F.3d at 694

A court may set aside agency action only if it is "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. § 706(2)(A); Citizens For Smart Growth v. Sec'y, Dept. of Transp., 669 F.3d 1203, 1210 (11th Cir. 2012).  This is an "exceedingly deferential" standard, Citizens for Smart Growth, 669 F.3d at 1210, and "a court is not to substitute its judgment for that of the agency." Judulang v. Holder, 132 S. Ct. 476 (2011) (citations omitted).  Judicial review is not toothless, however.

> Agencies . . . have expertise and experience in administering their statutes that no court can properly ignore. But courts retain a role, and an important one, in ensuring that agencies have engaged in reasoned decisionmaking. When reviewing an agency action, we must assess, among other matters, whether the decision was based on a consideration of the relevant factors and whether there has been a clear error of judgment. That task involves examining the reasons for agency decisions—or, as the case may be, the absence of such reasons.

Judulang, 132 S. Ct. at 483-84 (citations and internal quotation marks omitted).  "[A] claim under § 706(1) can proceed only where a plaintiff asserts that an agency failed to take a *discrete* agency action that it is *required to take*." Norton v. Southern Utah Wilderness Alliance, 542 U.S. 55, 64 (2004) (emphasis in original).  Generally, a court must be "at its most deferential" when reviewing scientific judgments and technical analyses within an agency's expertise. N. Plains Resource Council, Inc. v. Surface Transp. Bd., 668 F.3d 1067 (9th Cir. 2011) (quoting Balt. Gas & Elec. Co. v. Natural Res. Def. Council, Inc., 462 U.S. 87, 103 (1983)).  But, a failure by the agency to articulate a rational basis for its decision renders the decision arbitrary and capricious. City of Oxford, Ga. v. F.A.A., 428 F.3d 1346 (11th Cir. 2005); Sierra Club, 295 F.3d 1209.  See Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins. Co., 463 U.S. 29, 57 (1983)

---

(citation omitted) ("an agency's decision to select a previously rejected alternative is not a substantial change requiring an SEIS if 'the relevant environmental impacts have already been considered'").

[26] The 2006 and 2010 eligibility assessments that were compiled and submitted to the NPS Director for approval and were ultimately approved by NPS.  A.R. 13291.

("An agency's view of what is in the public interest may change, either with or without a change in circumstances. But an agency changing its course must supply a reasoned analysis . . ."). The Federal Defendants attempt to explain this away by arguing that the definition in 2010 was simply a re-wording of the 2006 definition used by the workshop group.

The Supreme Court has made clear that the APA does not allow "programmatic" challenges, but instead requires that Plaintiffs contest a specific final agency action which has "an actual or immediate threatened effect." Lujan v. Nat'l Wildlife Fed'n, 497 U.S. 871, 882-94, 110 S.Ct. 3177, 111 L.Ed.2d 695 (1990). In Lujan, the plaintiffs alleged that the defendants violated the Federal Land Policy Act, NEPA, and APA in the administration of the "land withdrawal review program" of the Bureau of Land Management, but failed to challenge any particular agency action that caused harm. Id. at 875, 891, 110 S.Ct. 3177. The Court held that the "land withdrawal review program" was not an identifiable, much less final, agency action or series of such actions within the meaning of the APA. Id. at 890.

In this case, the designation of land as wilderness eligible by the agency that may be ultimately recommended to the Department of Interior is in a sense "final agency action" as the designation that the land is eligible triggers action by the agency wherein all wilderness eligible lands are "managed to preserve their eligibility for designation." NPS Management Policies, A.R. 14412. The designation of a wilderness area can only be made by Act of Congress. 43 U.S.C. § 1782(b).

With regard to the NPS's interpretation of the Wilderness Act, the undersigned recommends that the NPS's interpretation of the statutory phrase "imprint of man's work substantially unnoticed" is not entitled to Chevron deference as the definition from which the workshop group worked in determining wilderness eligibility were never opened to public

comment, having been made public for the first time in the final GMP, compare A.R. 12779-84

with A.R. 13293, and bear none of the other circumstances invoking such deference. See

Wilderness Watch, Inc. v. Mainella, 375 F. 3d 1085, 1091 n.7 (11th Cir. 2004); Sierra Club v.

Leavitt, 488 F. 3d 904, 914-15 (11th Cir. 2007).   Chevron deference should be given when it

appears that "Congress delegated authority to the agency generally to make rules carrying the

force of law, and that the agency interpretation claiming deference was promulgated in the

exercise of that authority."   United States v. Mead Corp., 533 U.S. 218, 226-30 (2001).   In this

case, a group of individuals from NPS met at a workshop to determine the eligibility criteria they

would apply to decide whether land had an "imprint of man's work substantially unnoticed" –

hardly the notice-and-comment process.

> But whether or not they enjoy any express delegation of authority on a particular
> question, agencies charged with applying a statute necessarily make all sorts of
> interpretive choices, and while not all of those choices bind judges to follow
> them, they certainly may influence courts facing questions the agencies have
> already answered. '[T]he well-reasoned views of the agencies implementing a
> statute constitute a body of experience and informed judgment to which courts
> and litigants may properly resort for guidance,' and [w]e have long recognized
> that considerable weight should be accorded to an executive department's
> construction of a statutory scheme it is entrusted to administer ....

Mead Corp., 533 U.S. at 227-28 (quoting Bragdon v. Abbott, 524 U.S. 624, 642, 118 S.Ct. 2196,

141 L.Ed.2d 540 (1998) and Skidmore v. Swift & Co., 323 U.S. 134, 139-140, 65 S.Ct. 161

(1944))) (internal citations and quotations omitted).   In this case, NPS's interpretation of

"imprint of man's work substantially unnoticed," which changed slightly in 2010 from 2006,

appears only in the "Wilderness Eligibility Assessment" included in the Final Addition Lands

GMP/EIS.   It is not a published regulation "subject to the rigors of the Administrative Procedures

Act, including public notice and comment."   Reno v. Koray, 515 U.S. 50, 61, 115 S.Ct. 2021

(1995).   But the agency's interpretation is still entitled to "some deference."   Id.   See also

Metropolitan Stevedore Co. v. Rambo, 521 U.S. 121, 136, 117 S.Ct. 1953, 138 L.Ed.2d 327 (1997) (reasonable agency interpretations carry "at least some added persuasive force" where Chevron is inapplicable); Martin v. Occupational Safety and Health Review Comm'n, 499 U.S. 144, 157, 111 S.Ct. 1171, 113 L.Ed.2d 117 (1991) ("some weight" is due to informal interpretations though not "the same deference as norms that derive from the exercise of ... delegated lawmaking powers").  Pursuant to Skidmore, the weight accorded to an administrative judgment in a particular case "will depend upon the thoroughness evident in its consideration, the validity of its reasoning, its consistency with earlier and later pronouncements, and all those factors which give it power to persuade, if lacking power to control."  323 U.S. at 140.  "Our proper review of the exercise by the executive branch of its discretion to fill gaps, therefore, must be very limited."  Gonzalez, 212 F.3d at 1349 (citing Pauley v. BethEnergy Mines, Inc., 501 U.S. 680, 111 S.Ct. 2524, 2534, 115 L.Ed.2d 604 (1991)).

Given NPS's extensive involvement with assessing lands throughout the United States for wilderness eligibility, the undersigned recommends that it was not an abuse of its discretion in violation of the APA for NPS to change its interpretation of what an "imprint of man's work substantially unnoticed," means in the context of the Addition Lands.  In 2010, other information was available to NPS staff at the February 2010 wilderness workshop that had been unavailable at the 2006 workshop. Compare A.R. 4092-96 with A.R. 7155-64. In 2010, NPS had the benefit of an additional four years of experience managing the Addition, including experience managing infestations of invasive exotic species.   See, e.g., A.R. 7158-59 (noting that mechanized equipment was used to manage a Brazilian pepper infestation). NPS also utilized more recent aerial photography and geographic information system overlays.  A.R. 7157 (noting that staff reviewed aerial photographs from 2009). Moreover, participants had the benefit of information

discussed at the "Finalize Preferred Alternative Workshop," held on November 3-4, 2009, wherein NPS staff discussed public and agency comments to the Draft GMP/EIS, and specifically considered NPS's need to use mechanized equipment to restore disturbed lands and remove invasive exotic vegetation in areas of the Addition previously found to be wilderness eligible. A.R. 13500, 6487-91.  They also considered the extensive public comment and took that into consideration.   And participants at the February 2010 wilderness workshop describe disturbed areas in greater detail than the 2006 assessment.  Compare A.R. 4092-96, 12279-84 with A.R. 7155-64, 13291-304.

The NPS has been on the ground for decades in the Big Cypress Preserve and the Addition and know the condition of the lands and it is reasonable that the land may have changed over the years and that new information is available such that one interpretation in 2006 might not have been workable for the situation in 2010.  NPS has been tasked by Congress with recommending to the Secretary of Interior lands that are wilderness eligible, 16 U.S.C. § 1132, and the Court affords deference on this issue and will not pass judgment on it.

### B.  Count Four: Breach of NEPA

Plaintiffs assert that NPS violated NEPA by completing its GMP before NPS had the funding and staff to perform the necessary studies and research to make a proper determination of the ORV plan's impacts on the Addition's sensitive resources.  NPS allegedly resorted instead to making assertions as to many impacts that lack an adequate or rational explanation, are merely conclusory and that are contrary to the evidence.  Plaintiffs argue that NPS accordingly violated fundamental and established requirements of NEPA, 42 U.S.C. § 4332(2)(C), and made decisions that were arbitrary, capricious, and otherwise contrary to law under the APA, 5 U.S.C. § 706.

Defendants respond that NPS took the requisite "hard look" at all reasonably foreseeable environmental consequences of the proposed action and the alternatives, including the preferred action alternative, in the Addition GMP/EIS and that Plaintiffs have failed to meet their burden to show that the Addition GMP/EIS is arbitrary and capricious under NEPA.

Agency decisions allegedly violating NEPA are reviewed under the APA. Citizens for Smart Growth, 669 F.3d at 1203. A court may set aside agency action only if it is "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. § 706(2)(A); Citizens for Smart Growth, 669 F.3d at 1210. This is an "exceedingly deferential" standard, id., and "a court is not to substitute its judgment for that of the agency." Judulang v. Holder, 132 S. Ct. 476 (2011) (citations omitted).

This is also the standard used to review an agency's decision as to whether to supplement an environmental statement under NEPA. Marsh, 490 U.S. at 375, 378; Russell Country Sportsmen, 668 F.3d at 1044. A court looks to see whether an agency took a "hard look" at the environmental consequences of its proposed action. Smart Growth, 669 F.3d at 1211. "An agency has met its 'hard look' requirement if it has examine[d] the relevant data and articulate[d] a satisfactory explanation for its action including a rational connection between the facts found and the choice made." Sierra Club, 295 F.3d at 1216 (internal quotation marks and citation omitted).

The party challenging the decision has the burden of showing by a preponderance of the evidence that the agency did not comply with NEPA's procedural requirements. Smart Growth, 669 F.3d at 1211.

> The court will overturn an agency's decision as arbitrary and capricious under "hard look" review if it suffers from one of the following: (1) the decision does not rely on the factors that Congress intended the agency to consider; (2) the agency failed entirely to consider an important aspect of the problem; (3) the

agency offers an explanation which runs counter to the evidence; or (4) the decision is so implausible that it cannot be the result of differing viewpoints or the result of agency expertise.

Sierra Club, 295 F.3d at 1216.  See also Miccosukee Tribe of Indians v. United States, 566 F.3d 1257, 1264 (11th Cir. 2009).  "The agency need not have reached the same conclusion that the reviewing court would reach; the agency must merely have reached a conclusion that rests on a rational basis."  City of Oxford, Ga. v. F.A.A., 428 F.3d 1346, 1352 (11th Cir. 2005) (citing Sierra Club, 295 F.3d at 1216).

If the agency follows the process required by NEPA in deciding whether to take the action, even a capricious substantive decision will not violate NEPA because "NEPA merely prohibits uninformed-rather than unwise-agency action."  Van Antwerp, 526 F.3d at 1361-62 (quoting Robertson v. Methow Valley Citizens Council, 490 U.S. 332, 350-51 (1989) (footnote omitted)).  An agency decision which is explained "with less than ideal clarity" should be upheld "if the agency's path may reasonably be discerned."  Alaska Dep't of Envtl. Conservation v. E.P.A., 540 U.S. 461, 497 (2004).  "NEPA imposes procedural requirements before decisions are made in order to ensure that those decisions take environmental consequences into account."  Mainella, 375 F.3d at 1096.  These principles also apply when an EIS relies on mitigation measures to offset the adverse impacts of an action. An EIS that simply states mitigation measures without evaluating their effectiveness is "useless" in assessing whether adverse impacts would in fact likely be mitigated.  S. Fork Band Council of W. Shoshone of Nev. v. Dep't of the Interior, 588 F.3d 718, 727 (9th Cir. 2009).  The EIS must reflect that a "hard look" was taken not only at the adverse impacts, but also at the mitigation measures relied on.  A mere listing of or perfunctory statement about mitigation measures without supporting analysis is inadequate. Id.; Neighbors of Cuddy Mtn. v. Forest Serv., 137 F. 3d 1372, 1380 (9th Cir. 1998);

Mainella, 459 F. Supp. 2d at 102 & n.25; Van Antwerp, 709 F. Supp. 2d at 1271 (no evaluation of cost of mitigation).

Plaintiffs argue NPS violated NEPA by failing to obtain required information and by reaching unsupported conclusions about the impact of ORV use on hydrologic resources, the Florida Panther, natural soundscapes and the impact on non-motorized visitors, and vegetation communities and sloughs.  The Court will consider each of these issues in turn.

### 1. The impact of ORV use on hydrologic resources

Plaintiffs allege that NPS obtained no study on the impact of its ORV plan on critical surface water flows through the Addition or on water quality for the Addition GMP/EIS.  Rather, Plaintiffs allege, NPS sought to downplay those impacts by relying on the assignment of labels to impacts (e.g., "localized") that are conclusory, that run counter to the evidence, and that incorporate the off-setting benefits of mitigation measures without any evaluation of the effectiveness of those measures or the true impacts if they are ineffective.  In part, Plaintiffs point to the argument that oil and gas leakage from ORVs could have a "long term, adverse cumulative impact on water quality."  A.R. 13162.  The Federal Defendants respond that NPS has monitored surface water flow and quality in the Preserve, including the Addition, for decades, and currently collects water quality samples every other month at 20 stations located throughout the Preserve. A.R. 12999, 13718.  That based on this monitoring, as well as mitigation measures and studies in the Original Preserve, NPS concluded that the preferred action alternative's impacts on surface water flow and water quality would be "long term, moderate, adverse, and mostly localized." A.R. 13160-62.  Defendants argue that the record amply demonstrates that NPS took the requisite "hard look" at the effects of ORV use on surface water flows and water quality.

The record indicates that "[t]he extent, occurrence, and severity of effects that off-road vehicles have had on surface water flows of the Addition are largely unknown." A.R. 12997. The record cites two studies – Duever et al. (1981)[27] and Pernas et al. (1995) – that documented greater water flow rates within ORV ruts than in adjacent undisturbed areas. A.R. 12997. The. author of the Duever study "hypothesized that [ORV] trails that were extensively rutted and oriented parallel to flow could drain surface water from an adjacent wetland, particularly in low-lying areas" but which also "observed that topographic irregularities interrupted excessive drainage effects, that impacts tended to be localized." A.R. 12998 (citing Duever et al. (1986a)). With respect to water quality, a separate study by the same researcher found the effects of ORV use "were negligible, localized, and produced no threat to regional water quality." A.R. 12999 (citing Duever et al. (1986b)).

Plaintiffs cite to no alleged flaws in these studies, but argue that these studies are inapposite because water flows in the Addition are not the same as those in the Original Preserve. The record indicates that the Original Preserve is "essentially a rain-driven hydrologic unit," while the Addition is "more prominently influenced by upstream inputs from external drainages." A.R. 12994. Defendants argue that it is a distinction without a difference because although the Addition may be more affected by upstream water management practices than the Original Preserve, sheet flows within the Addition would not be affected differently by ORV trails. (Doc. #106, p. 29-30). They also cite to the Addition GMP/EIS's adaptive management procedures which would also mitigate any adverse effects. Pursuant to the adaptive management procedures, NPS will monitor "impacts from ORV use in the Addition, using a series of indicators and standards, including surface water flow and water quality." A.R. 12924, 12933.

---

[27] The Final Addition GMP/EIS indicates that the Duever et al. study is dated 1981, but the Court's review of the study indicates that it was first printed in 1979, and again in 1986. A.R. 18255.

The Final Addition GMP/EIS states that "[a]lthough a research project regarding surface water flow, water quality impacts, or wildlife effects has not been conducted, the Preserve has established 20 permanent water quality and water stage monitoring stations that could alert Preserve staff to changing conditions resulting from not only ORV use but other land uses as well, and monitoring of endangered/threatened species has been constant since before the ORV planning process began." A.R. 12936.

The undersigned recommends that the NPS took the requisite "hard look" at the impact of ORV use in the Addition on hydrologic resources. NPS reviewed the data on the hydrologic resources in the Original Preserve and included that it will monitor "impacts from ORV use in the Addition, using a series of indicators and standards, including surface water flow and water quality." A.R. 12924, 12933. Further, the Final Addition GMP/EIS states that "[a]lthough a research project regarding surface water flow, water quality impacts, or wildlife effects has not been conducted, the Preserve has established 20 permanent water quality and water stage monitoring stations that could alert Preserve staff to changing conditions resulting from not only ORV use but other land uses as well, and monitoring of endangered/threatened species has been constant since before the ORV planning process began." A.R. 12936. An agency decision which is explained "with less than ideal clarity" should be upheld "if the agency's path may reasonably be discerned." Alaska Dep't of Envtl. Conservation v. E.P.A., 540 U.S. 461, 497 (2004). Thus, the undersigned recommends that the Administrative Record reflects that the NPS took the requisite "hard look" at the effect of ORV use on hydrologic resources in the Addition. The agency did not fail entirely to consider the problem.

### 2. The impact of ORV use on the Florida panther

Plaintiffs next argue that the NPS did not obtain a study on the impact of its ORV plan on the Florida Panther and sought to downplay those impacts by relying on conclusory statements that run counter to the evidence and that rely on unevaluated mitigation measures.  In the Addition GMP/EIS, NPS concluded that the "[i]mpacts on the Florida panther under the preferred alternative would be long term, moderate, adverse, and mostly localized."  A.R. 13175.[28]  The Federal Defendants argue that this conclusion was based on available studies, decades of panther monitoring data, and NPS's experience implementing the Original Preserve ORV Plan, as well as on its consultation with FWS under the ESA. A.R. 13173-75, 13025. Defendants argue that NPS took a "hard look" at impacts of the proposed action on the Florida panther, which is all that NEPA requires.

The 2000 Plan stated that "[t]he decline [in panther numbers] is largely attributed to habitat loss and human disturbance." A.R. 13769. NPS was therefore aware that it needed studies of ORV impacts on panthers, which the 2000 Plan listed as a "high" priority.  A.R. 13692; see also A.R. 10900 (FWS 2000 requirement for studies). The Preserve sought funding for such a study in connection with work on the Addition GMP, to be titled "Evaluation of Responses to ORV Use and Hunting by Florida Panthers." A.R. 15504-07. But that funding request was denied because of limited availability of funds and higher priorities elsewhere in the National Park System. Id.

The Defendants state that NPS relied on several studies related to the Florida panther, including studies on population and distribution, predation, panther prey, mortality and vehicle injury, and mercury contamination. See A.R. 13401-11, 13025. NPS also relied on annual reports

---

[28] The GMP/EIS states that a moderate adverse impact to the Florida panther would result in impact to individual cats by disturbances that may interfere with critical periods (i.e., breeding, nesting, denning, feeding, resting) or habitat, but that the level of impact would not result in physical injury or mortality.  A.R. 13077.

resulting from its own panther monitoring and panther telemetry data. See A.R. 14846-95. With

respect to ORV use and its effects, NPS relied on a 1999 study by Janis and Clark, A.R. 16249-

16373, which compared panther telemetry data with data regarding hunting in the Bear Island

Unit of the Original Preserve, which is directly adjacent to the Northeast Addition. A.R. 12931,

13005, 13405. That study concluded that the "increase in the distance of panther locations from

trails is 'biologically minor' and probably related to prey behavior." A.R. 13005.

The Addition GMP/EIS states that "[a]t the time of writing this plan, information and

data that could be used to analyze impacts on the Florida panther from increases in ORV use

were limited." A.R. 13068.  It went on to note that that the NPS and FWS have commissioned

an analysis of historical data obtained largely from hunters regarding ORV use and panther

biology in the Preserve conducted by Fletcher and McCarthy.  A.R. 13068.  Fletcher delivered a

draft to NPS after the GMP had been finalized.  A.R. 8882-8938.  It is not clear if the Fletcher

and McCarthy report has been finalized, but the draft revisited the findings of Janis and Clark

(2002) using the current panther dataset that includes 10 additional years of radio telemetry

locations. A.R. 8889.  The Biological Opinion for the Addition included a discussion of the

preliminary draft of the Fletcher and McCarthy study, stating: "Overall, they found similar

relationships between panther movements and use and the presence of recreational ORV use."

A.R. 8613.

Defendants respond that under the adaptive management process outlined in the Addition

GMP/EIS, NPS will monitor any change in the population of both endangered species and game

species.  A.R. 12929.  With respect to the Florida panther, the GMP/EIS provides for closure of

an ORV trail upon "determination that a designated trail was within 0.5 miles of a den"— a

buffer distance based on the Janis and Clark study. A.R. 12931.  Defendants argue that Plaintiffs

also ignore measures in the Addition GMP/EIS designed to minimize the impacts of ORV use on the panther. As NPS has explained, the ratio of ORV trail miles to ORV permits in the Addition is based on the ratio used in the Original Preserve where "monitoring results indicate that ecological conditions are acceptable and actually improving for certain sensitive species." A.R. 13258. Further, these "ORV trails and permits would be phased in over time, depending on the results of monitoring." A.R. 13174. Adaptive management allows NPS the flexibility to modify the ORV trail system, including closing trails, in order to protect threatened and endangered species. A.R. 12931.

In their Brief, the Defendants frame the relevant question under NEPA as "whether there was enough scientific knowledge for decision-makers to take a hard look at impacts on the panther." Doc. #106, p. 33. The Court agrees and does not find that NPS's decision may be overturned under the categories set forth by the Eleventh Circuit in Sierra Club, 295 F.3d at 1216, as outlined above. In pertinent part, NPS did not "fail[] entirely to consider an important aspect of the problem." NPS used available data and experience regarding ORV use and its effects on the panther in the Original Preserve to extrapolate to the potential impacts (and in some cases benefits) to the Florida panther in the Addition Lands. NPS relied on several studies related to the Florida panther, including studies on population and distribution, predation, panther prey, mortality and vehicle injury, and mercury contamination. A.R. 13401-11, 13025, NPS also relied on annual reports resulting from its own panther monitoring and panther telemetry data. A.R. 14846-95. With respect to ORV, use NPS relied on a 1999 study by Janis and Clark, A.R. 16249-16373, which compared panther telemetry data with data regarding hunting in the Bear Island Unit of the Original Preserve, which is directly adjacent to the Northeast Addition. A.R. 12931, 13005, 13405. That study concluded that the "increase in the

distance of panther locations from trails is 'biologically minor' and probably related to prey behavior." A:R. 13005

The Court need not have reached the same conclusion, but the conclusion must be based on some rational basis, which the Court recommends it is. See Defenders of Wildlife v. Dept. of the Navy, 2012 WL 3886412 (S.D. Ga. Sept. 6, 2012) (emphasis added) (finding that the Navy took a "hard look" at the *potential* impacts of ship strikes on whales). Thus, the undersigned recommends that the Administrative Record reflects that the NPS took the requisite "hard look" at the effect of ORV use on the Florida panther in the Addition. The agency did not fail entirely to consider the problem.

### 3. The impact of ORV use on natural soundscapes and non-motorized visitors

Plaintiffs next argue that the GMP lacks any analysis of the impacts of the ORV plan on the Addition's natural soundscapes.[29]  Moreover, Plaintiffs assert that although soundscape impacts are likely to result in a significant impact on non-motorized visitors, as well as wildlife, the GMP seriously downplays that impact. The Addition GMP/EIS acknowledged that the addition of ORV users, together with the "construction of a new visitor contact station might result in user congestion and user conflict at trailheads and along the primary and secondary ORV trail network and would reduce the quality of the natural soundscape." A.R. 13193. It found that these impacts would be "long term, minor to moderate, and adverse," although it concluded that these impacts would be minimized by "dispersing users across multiple access points." A.R. 13193. Defendants argue that this was a reasonable conclusion, given the new access points to be established pursuant to the proposed action and was further supported by other mitigation measures in the GMP/EIS. See A.R. 12906-07. The Addition GMP/EIS

---

[29] Natural soundscapes exist in the absence of human-caused sound. A.R. 12880.

contains mitigation measures designed to reduce impacts to the natural soundscape and conflicts between motorized and non-motorized users. Under the Addition GMP/EIS, all ORV use is restricted to designated trails, and approximately 96,413 acres of the Addition is designated primitive backcountry. A.R. 12904. Those areas that are open to ORVs are subject to nightly and 60-day seasonal closures. A.R. 12928.   All ORVs "are required to have a muffler in good working condition and in constant operation" and no airboats are allowed in the Addition. A.R. 12924. The Addition GMP/EIS includes conceptual hiking trails and commits NPS to work with other involved agencies "to determine the appropriate access points and routing of the Florida National Scenic Trail to minimize conflicts between motorized and non-motorized users."  A.R. 12905.

NPS concedes that natural soundscapes in the Addition are important.  "Natural soundscapes in remote areas of the Preserve are necessary to fulfill the purposes of the Preserve and are key to the natural integrity and recreational values of the Addition." A.R. 13606-07.  The 2000 Plan, addressing the Original Preserve where hunting and ORV use was permitted, found that "[b]ird calls and other wildlife sounds would be more noticeable if the noise from ORVs was restricted to certain areas and buffered from non-motorized users." A.R. 13773. The Addition GMP/EIS, addressing the Addition where those activities are not now permitted, states that "[n]atural sounds generally predominate throughout the Addition," A.R. 13044; visitation to the Preserve has increased by those seeking solitude and/or non-motorized activities, A.R. 13033; natural sounds are important resource of the Preserve to be protected, A.R. 13042; and many non-ORV users seek natural soundscapes and solitude, A.R. 13044, 13046.

Plaintiffs argue that the GMP fails to address the impact of ORV noise on the experience of non-motorized visitors, and the panther and its prey despite the fact that the ORV trails will

snake throughout the Northeast Addition.  The GMP acknowledged that ORV use affects the natural soundscape. A.R. 12880, 13044, 13046 (ORV noise impacts non-ORV users and even hunters).  But no studies have been performed on the impact of ORVs on the natural soundscapes of the Addition or the Original Preserve.  NPS does have natural sound experts, who works at what is called its Natural Sounds Program. This group raised the question in commenting on the draft EIS how ORV trails could be allowed to "go[] right through the proposed wilderness" when "those wilderness areas adjacent to these trails would endure major noise impacts." A.R. 5210-11.  The GMP states that "[a]coustic monitoring was conducted in the original Preserve in the summer of 2008 by the John A. Volpe National Transportation Systems Center," A.R. 13042. That study was an attempt "to establish a base line from which noise impacts can be assessed" by determining "ambient sound level data," A.R. 14899, which is the "continuous background sound environment," A.R. 13042. It was merely "a quick turn-around summary of preliminary results," with a "much more comprehensive report [to] follow at a later date," although no such later report is in the record.  A.R. 14899.

There are no studies in the record comparing ambient sound level to that caused by ORV use.  Federal Defendants are relying, at least in part, on their experience in the Original Preserve with managing recreational ORV use and an adaptive management plan.  NPS found that "ORV use would adversely affect the natural soundscape of the area" but that "[i]mpacts would be reduced by the use of a designated trail system, limiting changes to natural conditions and wilderness character outside of the trail system." A.R. 13189.  In this case, NPS documented the potential impacts to soundscapes and addressed what NPS would do to preserve them as it stated: "The National Park Service will preserve, to the greatest extent possible, the natural quiet and natural sounds associated with physical and biological resources . . ." A.R. 13042.  Therefore,

the undersigned recommends that NPS evaluated reasonably foreseeable impacts of ORVs on the natural soundscape and identified management actions it would take to minimize conflict and therefore took the requisite "hard look" in compliance with NEPA.

### 4. The impact of ORV use on vegetation communities and sloughs

Plaintiffs assert that vegetation communities are a critical part of what makes the Preserve unique. Under the Establishment Act, Plaintiffs cite that NPS is required to preserve these special communities, 16 U.S.C. §698i(a), limiting and controlling ORV use as necessary to do so, id. § 698i(b).  Plaintiffs argue that NPS failed in that obligation and acted contrary to the evidence in finding that ORV use would have only a "moderate" adverse impact on cypress areas and only a "minor" adverse impact on prairies[30] and marshes in the Addition and in finding that ORV impacts on these areas would not impair the resources of the Preserve. And NPS reversed an earlier determination not to permit ORV use in sloughs,[31] now running a primary trail through Mullet Slough without any explanation of the change in position.

In the Addition GMP/EIS, NPS concluded that the preferred alternative's "impacts on cypress strands and domes, mixed hardwood swamps, and sloughs would be long term, moderate, adverse, and localized" and that its "impacts on prairies and marshes would be long term, minor, adverse, and localized." A.R. 13167-68.  With respect to cypress strands and domes, mixed hardwood swamps, and sloughs, NPS considered that "[d]evelopment of trailheads and access points . . . would result in vegetation loss or injury from construction activities," and that "[f]ormalization and establishment of up to 130 miles of ORV trails would result in similar

---

[30] Prairies are treeless areas dominated by grasses and grasslike plants.  A.R. 12979.  Cypress prairies are communities that transition between short-grass prairies and cypress-dominated swamp communities and typically contain elements of both.  A.R. 12979.

[31] Sloughs are elongated natural drainage channels, generally a few feet to a few inches below adjacent areas.  A.R. 12978.

impacts on vegetation." A.R. 13166. NPS further considered that "[i]mpacts on this vegetation community, such as trampling, injury or loss of plant material due to the effects of ORV traffic could occur within and along designated ORV trails," but noted that "conditions that often discourage ORV use (deep water, closely spaced trees, etc.) would continue." Id. Consequently, "adverse impacts from [ORVs] would most often be limited to the margins of the plant community." Id.

Defendants argue that this conclusion was based on mitigating measures relating to ORV use in both the Addition and the Original Preserve, as well as NPS's decades of ORV management experience in the Original Preserve.   Defendants assert that under the proposed action, ORV trails would only be designated in those areas NPS has previously determined are sustainable for such use, meaning that "negligible soil loss or movement" will occur and natural hydrology and plant life will not be adversely affected. A.R. 12929, 12927. NPS would also monitor trail use and implement adaptive management "to ensure that the trail system is functional and sustainable over time." A.R. 13270.  Further, the designation of the trails would be done in phases, as a result of on-the-ground monitoring. A.R. 12904-05. In addition, recreational ORV trails would only be designated on existing ORV trails—no new trails would be developed. A.R. 12929.  Defendants state that in the unlikely event that ORV use of cypress areas and sloughs exceeds predictions, the proposed action provides for adaptive management which would allow NPS to implement management actions to reduce the impacts from overuse of trails in cypress strands and sloughs, including trail closures. A.R. 12933-34.  The Addition GMP/EIS also indicates that NPS will practice ongoing vegetation management, including the use of prescribed fire, and efforts to restore natural hydrologic processes would continue to improve the conditions for native vegetation.  A.R. 13167.

The undersigned's review of the record on the issue of vegetative communities reveals that the NPS took a "hard look" at the effect ORVs would have on the vegetative communities and that NPS proposed and put in place management for dealing with the issue, drawing from their experience in the Original Preserve.   The Record of Decision indicates that the issue was looked at and mitigation measures were put into place, such as re-vegetation plans, restoration, and monitoring.

With regard to Mullet Slough, Plaintiffs single out this slough because the NPS determined in the 2000 Plan for the Original Preserve that ORV use would not be permitted in this area because of its "environmental and wildlife sensitivity to ORV use."   A.R. 13674. Mullet Slough extends into the Addition south of I-75.   A.R. 13298, 13304.   In the Addition GMP/EIS, NPS plans to run a primary trail through portions of Mullet Slough.  See A.R. 12907 (Map 5).   Federal Defendants do not dispute the fact that a recreational ORV trail runs in Mullet Slough.   Doc. #115, p. 13.   The Plaintiffs argue that the GMP fails to provide a rational explanation for NPS's reversal of position on permitting ORV use in Mullet Slough, and fails even to disclose or acknowledge that change in position after expressly eliminating ORV use in Mullet Slough in the Original Preserve.   The Court recommends that there were no NEPA violations in this regard and NPS's decision to allow ORV use through the Mullet Slough was not arbitrary and capricious.   The NPS was free to consider the vegetative communities in the portions of the Mullet Slough that run through the Original Preserve and in the portions that run through the Addition Lands separately and make decisions regarding ORV use in each.   Just because ORV use is prohibited in certain portions of the Mullet Slough, and not others, does not make the decision to allow ORV use arbitrary and capricious.[32]   All that is required is for NPS to

---

[32] Portions of Mullet Slough that run through the Addition Lands were designated as wilderness eligible in the April 2010 Wilderness Eligibility Assessment to the Addition Lands GMP/EIS.   A.R. 13298.   This would require that at

take the requisite "hard look" at the potential effects of ORV use, which the undersigned recommended NPS did.

### 5.  NPS's reliance on the Original Preserve ORV Management Plan

Finally, Plaintiffs argue that NPS's reliance on the ORV management plan adopted for the Original Preserve in the 2000 Plan is arbitrary and capricious in contravention of NEPA's requirements.  Plaintiffs assert that NPS has failed to evaluate the effectiveness of its ORV management plan in the Original Preserve before relying on it as effective for the Addition Lands to mitigate ORV impacts.  Plaintiffs argue that there is ongoing and widespread failure by ORV users to comply in the Original Preserve with the ORV management plan and that the NPS has not had the staff to properly enforce the Plan.  In response to this, Defendants point out that the record shows that NPS has conducted extensive monitoring of the Original Preserve since the adoption of the Original Preserve ORV Plan, including monitoring compliance with the plan, and that NPS has gained management experience that will be valuable to implementing a designated ORV trail system in the Addition. See, e.g., A.R. 16374-17808 (NPS incident reports reflecting ground and aerial monitoring of compliance with restrictions on ORV use), 12999, 13718 (describing monitoring of surface water flow and quality), 12774-85 (describing periodic photo-monitoring of certain trails in the Bear Island Unit of the Original Preserve), 11520-35 (summary of exotic plant management in Original Preserve and Addition), 12935 (explaining that NPS has "determined the best and most cost efficient methods" of trail stabilization based on eight years of experience).   And that with respect to enforcement of restrictions on ORV use, the Addition GMP/EIS specifically provides that the ORV trail system and associated ORV permits would be

---

least this area of Mullet Slough not be opened to recreational ORV use until Congress had acted on any wilderness recommendation.  See NPS Policies, § 6.3.1, A.R. 14411.

phased in over time and, after the initial trail designation, additional trails would only be designated if NPS found that impacts from the ORV use was at acceptable limits A.R. 12905. This would be determined by monitoring the impacts on the various "indicators and standards," which would include monitoring the amount of "off-trail travel by motorized and non-motorized users," "trail widening as a result of motorized and nonmotorized use," and "documented violations." A.R. 12920. If the appropriate standards were exceeded, NPS would then implement adaptive management actions which could include trail closure, trail relocation, and altering the types of trail use permissible. A.R. 12933-34.

Defendants further argue that NPS properly relied on the Original Preserve ORV plan to mitigate impacts of the proposed action, pointing to the fact that NPS has managed the Original Preserve for almost 40 years.  Through that time, it has gained considerable expertise in implementing and enforcing the designated trail system in the Original Preserve and its reliance on the Original Preserve ORV Plan to mitigate adverse effects of ORV use clearly satisfies NEPA's requirements.

In the Addition GMP/EIS, NPS stated that the administration and management of ORV use for the Addition would be the same as it is in the Original Preserve, with a few exceptions. A.R. 12924.  The Original Preserve ORV Plan has been held by this Court to be NEPA compliant.  See Wildlife Conservation Fund of America v. Norton, No. 2:01-cv-25-FtM-29DNF (Doc. #116) (Feb. 22, 2006) ("The Court finds that the Final Recreational Off-Road Vehicle Management Plan for Big Cypress National Preserve Supplemental Impact Statement was not arbitrary or capricious, was not an abuse of discretion, and was not otherwise contrary to law. The Final Plan suffers from none of the defects which would justify the Court's rejection.").

The undersigned recommends that it is not arbitrary and capricious for NPS to rely on the 2000 ORV Management Plan to implement ORV management in the Addition Lands.[33]

### C.  Counts 6 and 7: Endangered Species Act Violations

The Addition has long served as a vital refuge for federally listed species.  According to NPS, eight of the nine listed species that reside in the Preserve "are known to be present in the Addition." A.R. 13000.  However, Plaintiffs argue that in purportedly evaluating the effects to these species as required by the ESA, FWS cut many corners in order to produce a final product for NPS in time to meet NPS's self-imposed GMP deadline. As a result of this rushed process, FWS's November 17, 2010 Biological Opinion ("BO"), A.R. 13419-93, entirely omits key biological data, reaches conclusions unsupported by the record and simply fails to meet the rigor with which FWS is required to conduct its analysis under the ESA.  The Defendants respond, arguing that in rendering its BO on the GMP/EIS in consultation with the NPS, FWS properly evaluated the potential effects of the GMP/EIS on each of the species at issue in this case. For most of the species, NPS and FWS elected to utilize the "informal consultation" procedure established under the ESA consultation regulations, 50 C.F.R. § 402.13. FWS reasonably concluded that the GMP/EIS is not likely to adversely affect the Eastern Indigo snake, among other species. A.R. 8593. NPS and FWS undertook the "formal consultation" process with respect to the Florida panther, and FWS rendered its BO that the GMP/EIS is not likely to jeopardize the continued existence of the species. A.R. 8630.

---

[33] It is important to note that the ORV management plan with respect to the Addition Lands has yet to be implemented and that full implementation could be many years or may not occur if funding is not obtained.  A.R. 12396.  And it is not clear that NPS has yet designated a final ORV trail system in the Addition Lands. See A.R. 12936 ("Development of the designed access points and trail system that would provide riding opportunities for the public may take up to five years.").  A "conceptual" ORV trail was developed by the GMP planning team for inclusion in the Final Addition GMP/EIS.  A.R. 12927.  The Court is making no recommendations at this time as to whether the actions taken by NPS when the ORV management plan is implemented in the Addition Lands are NEPA compliant.

Section 7 of the ESA requires that federal agencies consult with FWS to ensure that actions the agency authorizes are not likely to jeopardize the continued existence of species listed as "threatened" or "endangered," or adversely modify or destroy habitat designated as critical to the survival of a listed species. 16 U.S.C. § 1536. If the proposed action may affect a listed species, formal consultation between the agency and the FWS is required. Id.; 50 C.F.R. § 402.14. When formal consultation is initiated, the agency is required to provide the FWS information about the proposed project and the "best scientific and commercial data available." 50 C.F.R. § 402.14(d). The FWS then prepares a biological opinion addressing whether the action will jeopardize the species. Id.

The ESA prohibits the "take" of any endangered species, and it defines "take" to include "harm," which in turn includes "significant habitat modification or degradation where it actually kills or injures wildlife by significantly impairing essential behavioral patterns, including breeding, feeding, or sheltering." 16 U.S.C. § 1532(19); 50 C.F.R. § 17.3. If the proposed action will not jeopardize the species but still might result in incidental harm to it, FWS attaches to the biological opinion an Incidental Take Statement ("ITS") establishing the terms and conditions under which the incidental take may occur. 50 C.F.R. § 402.14(i); Miccosukee Tribe of Indians, 566 F.3d at 1263.

Re-initiation of formal consultation is required and shall be requested by the Federal agency or by the Service where discretionary Federal involvement or control over the action has been retained or is authorized by law and:

> If the identified action is subsequently modified in a manner that causes an effect to the listed species or critical habitat that was not considered in the biological opinion.

50 C.F.R. § 402.16(c).   Generally, a court must be "at its most deferential" when reviewing scientific judgments and technical analyses within an agency's expertise. N. Plains Resource Council, Inc. v. Surface Transp. Bd., 668 F.3d 1067 (9th Cir. 2011) (quoting Balt. Gas & Elec. Co., 462 U.S. at 103). But, a failure by the agency to articulate a rational basis for its decision renders the decision arbitrary and capricious. City of Oxford, Ga., 428 F.3d 1346; Sierra Club, 295 F.3d 1209.

NPS formally consulted with FWS regarding ORV use and its potential effect on the endangered species, as required by the ESA.  As discussed earlier, on November 18, 2010, FWS issued its BO for the Final Addition GMP/EIS. A.R. 8583. In its BO, FWS concurred with the NPS's determinations that the proposed action was not likely to adversely affect the red-cockaded woodpecker, the West Indian manatee, the wood stork, the Everglades snail kite, the American Crocodile, and the Eastern Indigo snake. A.R. 8592-94.

FWS also concluded that the proposed action was not likely to jeopardize the Florida panther. A.R. 8630. In support of this conclusion, the BO cited available information concerning the effects of ORV use on panthers in other areas of the Preserve. This information included a 2002 study by Janis and Clark, A.R. 16249 & 14375, and a 2010 draft study by Fletcher and McCarthy, A.R. 7908. Both studies observed that panthers moved away from trails during the hunting season. A.R. 8627. However, based on these studies, FWS concluded that the observed movement away from trails has "minor biological consequences."  Id.  FWS authorized "incidental take" of Florida panthers in the form of harassment in the accompanying ITS.  A.R. 8631.  Plaintiffs allege ESA violations with respect to the Eastern Indigo snake and the Florida panther, specifically.

### 1. Eastern Indigo Snake

Plaintiffs argue that the FWS and NPS acted arbitrarily by refusing to engage in formal consultation with respect to the Eastern Indigo snake.  In its BO, FWS concurred with the NPS's determinations that the proposed action was not likely to adversely affect the Eastern Indigo snake. A.R. 8592-94.  FWS concluded that activities with the potential to affect the snake were the construction of new access points or recreational facilities and the use of ORV trails. A.R. 8593. Construction of new access points or recreational facilities would likely require permits from the U.S. Army Corps of Engineers, and therefore result in additional, project-specific ESA consultation in the future.  Id.  In light of the minimization and mitigation measures proposed by NPS, it concluded that any change in territory size or configuration resulting from ORV use would not result in measurable changes in feeding, breeding, or sheltering behaviors of the Eastern Indigo snake.   Thus, the Final BO concluded that "[t]he NPS determined that development and implementation of the GMP is not likely to adversely affect the eastern indigo snake.   Based on the information provided in the GMP and summarized above, the Service [FWS] concurs."  A.R. 8593.

On June 14, 2010, NPS completed its draft Biological Evaluation ("BE"), see AR 7597-7614, which — along with a draft version of the GMP — NPS submitted to FWS on August 10, 2010 to serve as its Biological Assessment. A.R. 7896; see also 50 C.F.R. § 402.12(a) (describing purpose of a biological assessment). In that BE, NPS determined that the GMP "is likely to adversely affect" the snake and acknowledged many long-term impacts to the snake that would occur including "adverse effects on potential eastern indigo snake habitat," "[n]oise from off-road vehicles … [that] would disturb or flush snakes and thus might disrupt normal foraging, breeding, or dispersing," "disturb[ance] or degrade[ation] [of] vegetative groundcover and soil

substrates in areas that support foraging, breeding, and snake burrows or refuges," and forcing "eastern indigos to leave the area, abandon den sites, and miss foraging and mating opportunities." A.R. 7604-05.  The thinking on the Eastern Indigo snake changed though as the agencies continued to consult.  On September 9, 2010, the FWS biologist working on the BO decided "I actually think we can have not likely to adversely affect for [the snake]. Conservation measures for the eastern indigo snake should reduce risk to an insignificant level. It is sometimes one of those species that can go either way, so let's take the easier road for us with it, ok?" A.R. 7952.  On that basis, NPS and FWS spent the next several weeks rewriting their respective consultation documents to exclude the snake from consideration in formal consultation.  See A.R. 15566, 7991-8010, 8028-49, 15596, 15748. In NPS's rewritten September 28, 2010 BE, the agency asserted that the GMP "is not likely to adversely affect" the snake. A.R. 15756-57.  NPS still acknowledged, however, the many serious impacts to the species, but found that the effects would be "reduced by [certain] avoidance and minimization measures" NPS planned to adopt. A.R. 15757, 15764.  In rendering its November 17, 2010 BO, FWS concurred with NPS's revised "not likely to adversely affect" determination, in part because, despite explicit recognition by FWS that snakes "have been seen in the Addition Land" and that their habitat and prey will be affected by the GMP, "NPS has incorporated an education program to inform users of the Addition Lands of the presence of, description of, and protections afforded this species." A.R. 13429; 13508-09 (list of conservation measures).

Where an agency determines that its action "may affect listed species or designated critical habitat[,] 50 C.F.R. § 402.14(a), it must pursue some form of consultation ("informal" or "formal"), with FWS.  50 C.F.R. §§ 402.13, 402.14.  "If during informal consultation it is determined by the Federal agency, with the written concurrence of the Service, that the action is

not likely to adversely affect listed species or critical habitat, the consultation process is terminated, and no further action is necessary." 50 C.F.R. § 402.13(a).

In this case, the record demonstrates that NPS and FWS engaged in "informal consultation" regarding the Eastern Indigo snake.  FWS's "not likely to adversely affect" concurrence is supported by the NPS's September 27, 2010 BE, which describes the conservation measures to be implemented to reduce potential adverse effects to the threatened and endangered species. A.R. 8177. As summarized in the biological evaluation, the Addition GMP/EIS provides that all facilities will be located away from known Eastern Indigo snake nesting sites and refugia habitat. A.R. 8192. NPS will periodically check the nesting and refugia areas for evidence of effects on the snake and take appropriate corrective actions as needed. Id. NPS will evaluate Eastern Indigo snake surveys and habitat/population data before taking any action that might cause harm or disturb snake habitat value. Id. NPS will also protect Eastern Indigo snake habitat through future ESA consultations for the development of recreational access points, including ORV trail access areas. Id. Where applicable, restoration and monitoring plans would be developed and implemented per the recommendations of FWS and the FWC. Id. The Addition GMP/EIS also provides for a special status species education plan to provide information about the snake and other species in an attempt to minimize or eliminate avoidable habitat or individual disturbances from human activity.  Id.  Finally, NPS will take measures to reduce adverse effects of non-native plants and wildlife on snake habitat. Id. at 8193.

Based on the NPS's biological evaluation, FWS determined that "conservation measures for the eastern indigo snake should reduce risk to an insignificant level." A.R. 7952.  Therefore, FWS concurred with NPS's determination that "the development, and implementation of the GMP is not likely to adversely affect the eastern indigo snake" as included in the BO.  A.R.

8593.  Once the plan is found "not likely to adversely affect listed species or critical habitat" the consultation process is terminated, and no further action is necessary.  50 C.F.R. § 402.13(a).  Thus, formal consultation in this case was not triggered as "a federal agency need not initiate formal consultation if, as a result of the preparation of a biological assessment under § 402.12 or as a result of informal consultation with the Service under § 402.13, the Federal agency determines, with the written concurrence of the Director, that the proposed action is not likely to adversely affect any listed species or critical habitat."  50 C.F.R. § 402.14(b)(1).  There is no indication in the record that FWS was arbitrary and capricious in foregoing the formal consultation process in light of its determination, in consultation with NPS, that the GMP/EIS was not likely to adversely affect the Eastern Indigo snake.

### 2. Florida Panther

Plaintiffs next argue that the FWS failed to consider the direct and indirect effects of the GMP on Florida panthers and failed to consider the best available science.  NPS and FWS undertook the "formal consultation" process for the panther.  FWS concluded that the proposed action was not likely to jeopardize the Florida panther. A.R. 8630. In support of this conclusion, the BO cited available information concerning the effects of ORV use on panthers in other areas of the Preserve. This information included a 2002 study by Janis and Clark, A.R. 16249 & 14375, and a 2010 draft study by Fletcher and McCarthy, A.R. 7908. Both studies observed that panthers moved away from trails during the hunting season. See A.R. 8627. However, based on these studies, FWS concluded that the observed movement away from trails has "minor biological consequences." Id.

Defendants respond that, as required under the ESA consultation regulations, 50 C.F.R. § 402.14(g)(3), the FWS biological opinion evaluated the effects of the action, including "the

direct and indirect effects of an action on the species or critical habitat, together with the effects of other activities that are interrelated or interdependent with that action, that will be added to the environmental baseline," id. § 402.02.  See A.R. 8621. FWS specifically addressed the potential for panther and prey disturbance as a result of recreational activities in the Addition Lands. A.R. 8627.

### (a) Effects of the GMP on the Panther

With regard to Plaintiffs' first argument, that the FWS violated the ESA in its BO by failing to consider effects of the GMP on the Florida panther, as part of the section 7 process, FWS is required to "[e]valuate the effects of the action," 50 C.F.R. § 402.14(g)(3), which are defined as "the direct and indirect effects of an action on the species or critical habitat, together with the effects of other activities that are interrelated or interdependent with that action, that will be added to the environmental baseline." Id. § 402.02.  Plaintiffs assert that although FWS evaluated the loss of panther habitat from NPS's authorization of 130 miles of primary ORV trails, see A.R. 13461, 13468 (concluding that panthers would avoid 16,808 acres, or 11% of the Addition, due to the GMP), FWS never assessed other impacts of the GMP, including in part the extensive secondary trail system that NPS concedes will necessarily branch off of the primary trails within the half-mile corridors NPS has excluded from wilderness eligibility, see, e.g., A.R. 12928 (allowing secondary trails to access "campsites, hunting areas, or other recreational use areas").  FWS recognized the importance of the extent of secondary trails to its analysis, and requested such information from NPS in order to complete its analysis, stating that "some sort of estimate on the maximum extent of secondary trails" would "really help" in the analysis. A.R. 8022. NPS rejected this request for actual data critical to FWS's assessment, instead instructing FWS to "stay away from that," and "focus on the spirit an [sic] intent of the plan."  Id. As a

result, FWS concluded that because NPS "did not provide an estimate of the number of miles of secondary trails that may be opened. … NPS may have to reinitiate consultation to address the establishment of secondary trails in the future" and their effect on incidental take.  A.R. 13468.

While the BO includes no analysis of the location of the secondary trails in the Addition Lands, the BO acknowledges that the "Incidental Take Statement refers only to the primary trails described in the PA of the GMP.  We understand that this means the NPS may have to reinitiate consultation to address the establishment of secondary trails in the future."  A.R. 13468.  Therefore, there is no agency action at this point for the Court to review regarding the effects of the secondary trails on the Florida panther and the BO indicates that NPS will reinitiate consultation to address the establishment of secondary trails in the future and their effects on the Florida panther.  Thus, the Court recommends that FWS's BO was not arbitrary and capricious in this regard.

### (b) Best Scientific Data Available

Plaintiffs also argue that the FWS violated the ESA by failing to rely on the best scientific evidence in assessing the baseline.  See 16 U.S.C. § 1536(a)(2) ("In fulfilling the requirements of this paragraph each agency shall use the best scientific and commercial data available.").  As discussed above, NPS has not included a specific study as to whether the placement of the ORV trails and their anticipated level of use in the Addition would affect the endangered panther.  NPS relies on a 2010 draft study where Fletcher and McCarthy evaluated "over 20 years of hunter check-in data... in concert with panther telemetry and other data to attempt to replicate and refine the Janis and Clark study" and they "found similar relationships between panther movements and use and the presence of recreational ORV use" to those found in the Janis and Clark study.  A.R. 8613, 7908-35.  NPS used available data and experience

regarding ORV use and its effects on the panther in the Original Preserve to extrapolate to the potential impacts (and in some cases benefits) to the Florida panther in the Addition Lands. Plaintiffs argue this violates the ESA's requirement that the NPS use the best scientific data available because there are difference in the ecologies of the Addition Lands and the Original Preserve.   Defendants disagree, asserting that based on the best available scientific data concerning panther behavior in the adjacent Bear Island Unit, FWS determined that panthers will potentially avoid using 16,808 acres during hunting season. A.R. 8631-32.  The GMP concluded though (relying on the Janis and Clark study) that although some panthers may avoid ORV trails during hunting season, the best available scientific evidence suggests that this behavior "probably has minor biological consequences."  A.R. 14382.

In this case, the NPS relied on scientific data regarding the effects of ORV use in the Original Preserve to extrapolate that into the effects on the Addition Lands.  Plaintiffs have pointed to no other scientific data that is available for FWS's and NPS's review regarding the effects of ORV use on the Florida panther which they ignored.  All of the Plaintiffs' arguments stem from the failure of NPS to conduct studies on the panther in the Addition Lands.  "The general view is that the agency decides which data and studies are the 'best available' because that decision is itself a scientific determination deserving deference."  Miccosukee Tribe, 566 F.3d at 1265 (citing Marsh v. Or. Natural Res. Council, 490 U.S. 360, 377-78, 109 S.Ct. 1851, 1861, 104 L.Ed.2d 377 (1989) ("When specialists express conflicting views, an agency must have discretion to rely on the reasonable opinions of its own qualified experts even if, as an original matter, the court might find contrary views more persuasive."); Balt. Gas & Elec., 462 U.S. at 103, 103 S.Ct. at 2255; San Luis v. Badgley, 136 F. Supp. 2d 1136, 1151 (E.D. Cal. 2000) (explaining that under the Endangered Species Act, "[a]n agency has wide latitude to

determine what is the best scientific and commercial data available" (quotation marks omitted)). "In deciding what is 'best available' the Service is required to seek out and consider all existing scientific data." <u>Miccosukee Tribe</u>, 566 F.3d at 1265.  Thus, the undersigned recommends that FWS relied on the best available scientific data in the BO and therefore did not violate the ESA in this regard.

### (c) Incidental Take Statement

Plaintiffs further argue that FWS violated the ESA by issuing a vague ITS with regard to the Florida panther, which renders Sections 7 and 9 of the ESA meaningless.

If a biological opinion finds that the action is not likely to jeopardize the existence of a listed species, but may result in the otherwise unlawful "take" of individual animals, FWS must prepare an ITS which permits an agency to "take" a specified number of members of the species if the taking is incidental to an otherwise lawful activity, 16 U.S.C. § 1536(b)(4); 50 C.F.R. § 402.14(i), and that the agency comply with required terms and conditions of the ITS to minimize and mitigate take, 16 U.S.C. §§ 1536(c)(2), 1536(b)(4).  If the amount or extent of taking specified in the ITS is exceeded, re-initiation of formal consultation is required. 50 C.F.R. § 402.16.

Here, FWS's incidental take statement found that takes will occur as a result of ORV use and ORV-assisted hunting pursuant to the GMP "in the form of harassment" that is "not likely to jeopardize the continued existence of the Florida panther," as panthers are flushed and displaced by the movement and noise of ORVs.  A.R. 13467-68; <u>see also</u> 50 C.F.R. § 17.3 (defining "harass").  FWS explained that the authorized harassment is anticipated to include all "panthers associated with the Addition Lands and within the 25-mile buffer area."  A.R. 8631.  The BOs incidental take statement did not authorize incidental take in the form of any direct mortality or

injury of any panthers. A.R. 8631. The ITS also specified terms and conditions in order to be exempt from the prohibitions of Section 9 of the ESA. A.R. 8632. The terms and conditions called for NPS to: (1) minimize human disturbance and habitat degradation; (2) minimize take through a better understanding of the interactions of the Florida panther and its environment in the Addition Lands; and (3) notify FWS upon locating a dead, injured, or sick threatened or endangered species. Id. at 8632-33.

Plaintiffs argue, however, that the FWS's BO did not quantify how much take is allowed before triggering re-initiation of formal consultation to reevaluate the BO, nor did FWS explain why such a numerical take limit would be impractical as FWS and others have consistently counted and radio-tagged panthers in the Preserve. A.R. 13431-33 (describing counts and radio-tagging). Defendants respond that the BO specifies that as of August 2010, there were a total of at least 29 known radio-collared panthers with home ranges that intersect with or are contained within the Action Area, which includes the Addition Lands and the surrounding 25-mile buffer area. A.R. 8618, A.R. 8659 Fig. 2 (map of Action Area). However, less than a third of the panther population is radio collared at any time. A.R. 8631. Additional panthers may be detected in a given area through physical evidence such as scat or tracks, but FWS explained that "counting the exact number of panthers responsible for creating physical evidence can be problematic." Id. Annual panther population counts serve as "an indication of population trend rather than an actual count since in any one 12-month period some of the panthers recorded will die, kittens previously documented at the den may become dependent-aged juveniles, and un-collard subadults, particularly males, may disperse into other areas." Id. Defendants argue that the FWS explained that counting the exact number of panthers responsible for creating physical evidence can be "problematic," which read in context means that it would be "impractical."

68

Plaintiffs cite to <u>Miccosukee Tribe</u>, 566 F.3d at 1275, for support ("We apply instead the rule that specific population data is required unless it is impractical.").

In <u>Miccosukee Tribe</u>, the Eleventh Circuit reviewed the legislative history of the ESA on the issue of incidental take, stating that "Congress wanted incidental take to be stated in numbers of animals where practical, not in terms of habitat markers. Commenting on how incidental take statements were to '[s]pecif[y] the impact ... on the species,' as required by 16 U.S.C. § 1536(b)(4)(i), the House Report states:

> Section 7(b)(4) requires the Secretary to specify the impact on [sic] such incidental taking on the species. The Committee does not intend that the Secretary will, in every instance, interpret the word "impact" to be a precise number. Where possible, the impact should be specified in terms of a numerical limitation .... The Committee recognizes, however, that it may not be possible for the Secretary to specify a number in every instance. For example, it may not be possible to determine the number of eggs of an endangered or threatened fish which will be sucked into a power plant when water is used as a cooling mechanism. The Committee intends only that such numbers be established where possible.

<u>Miccosukee Tribe</u>, 566 F.3d at 1274 (citing H.R. Rep. No. 97–567, at 27 (1982), reprinted in 1982 U.S.C.C.A.N. 2807, 2827).   "We apply instead the rule that specific population data is required unless it is impractical.  The rule makes sense."  <u>Miccosukee Tribe</u>, 566 F.3d at 1275. The court went on to conclude that the law requires "that the incidental take statement contain an adequate trigger for re-consultation and that the trigger be expressed in population terms unless it is impractical to do so."  <u>Id.</u>  (also citing <u>Or. Natural Res. Council v. Allen</u>, 476 F.3d 1031, 1037 (9th Cir. (2007)) ("Congress has clearly declared a preference for expressing take in numerical form, and an Incidental Take Statement that utilizes a surrogate [measure] instead of a numerical cap on take must explain why it was impracticable to express a numerical measure of take.").

In this case, the BO states that the Service anticipates that panthers in the Addition Lands within the 25-mile buffer Action Area could be incidentally taken as a result of the proposed

action and that counting the exact number of panthers can be "problematic." A.R. 8631.  The

BO explains that less than a third of the panther population is radio collared at any one time, and,

due to their large home ranges (resident males have a mean home range of 160,639 acres and

females 97,920 acres) and the fact that they occur in low densities (1 to 8 per 100 mi$^2$), counting

the exact number of panthers responsible for creating physical evidence can be problematic.

A.R. 8631.  The annual population count reflects the number of panthers confirmed by physical

evidence during one calendar year and serves as a trend rather than an actual count.  A.R. 8631.

Based on this, the undersigned recommends that the ITS did not violate the ESA as the

ITS explained that specific population data is impractical for the Florida panther in the Addition

Lands.  NPS and FWS have expertise in the area of monitoring Florida panther populations and

their assessment of the impracticability of including a numerical quantification of when formal

consultation will be re-initiated was not in contravention of the ESA.

### D. Counts Two and Five: Big Cypress Establishment Act, National Park Service Organic Act, and APA

Plaintiffs next assert that the Addition Lands GMP/EIS violated the explicit resource

conservation mandates under the Big Cypress Establishment Act and the National Park Service

Organic Act of 1916, and is arbitrary, capricious, and otherwise contrary to law, in violation of

the APA, 5 U.S.C. § 706.  Compliance with the Big Cypress Establishment Act and the Organic

Act is reviewed under the arbitrary and capricious standard of the APA.  See, e.g., Wyoming v.

U.S. Dep't of Agric., 661 F.3d 1209, 1226.  Plaintiffs cite 16 U.S.C. § 698i(a) of the

Establishment Act wherein the Secretary of the Interior was authorized to acquire property

within the Preserve, 16 U.S.C. § 698f(c), and required to administer the Preserve as a unit of the

National Park System "in a manner which will assure their natural and ecological integrity in

perpetuity in accordance with the provisions of sections 698f to 698m-4 of this title and with the

provisions of sections 1, 2, 3, and 4 of this title, as amended and supplemented." 16 U.S.C. §

698i(a).  In 1916, the National Park Service Organic Act created the NPS within the Department

of Interior. 16 U.S.C. § 1. This federal agency under the United States Department of Interior

was required to:

> promote and regulate the use of the Federal areas known as national parks,
> monuments, and reservations ... as provided by law, by such means and measures
> as conform to the fundamental purpose of the said parks, monuments, and
> reservations, which purpose is to conserve the scenery and the natural and historic
> objects and the wild life therein and to provide for the enjoyment of the same in
> such manner and by such means as will leave them unimpaired for the enjoyment
> of future generations.

Id.

In their Brief Plaintiffs argue that NPS violated these Congressional conservation

mandates, citing to actions taken by NPS in specific areas that were already addressed by the

Court above.  See Doc. #103, pp. 65-69 (citing flawed analyses of impairment findings on

hydrologic resources, soundscapes, vegetation and wildlife, impacts on non-motorized users,

impact on prairies, Mullet Slough, and reliance on the 2000 ORV Preserve Management Plan).

Because the Court has recommended that the administrative record does not reflect that the

NPS's decisions were arbitrary and capricious in these areas, the Court recommends that

Plaintiffs motion for summary judgment as to Counts Two and Five be denied.

### E. Count Three: Violations of Executive Orders 11,644 and 11,989

Plaintiffs argue that NPS authorized the 130-mile primary trail network without

considering or applying the "minimization criteria" of Executive Orders 11,644 and 11,989, and

are arbitrary, capricious, and otherwise contrary to law, in violation of the APA, 5 U.S.C. § 706.

Neither Executive Order 11,644 nor 11,989 create a private cause of action. However, in

certain circumstances, judicial review is available under the APA to challenge final agency

action or inaction that violates an executive order.  City of Carmel-by-the-Sea v. U.S. Dep't of Transp., 123 F.3d 1142, 1166 (9th Cir. 1997). Plaintiffs may challenge agency action under an executive order if the executive order meets three requirements: First, the executive order must have a "specific statutory foundation."  Id.  If an executive order has a specific statutory foundation, it is given the effect of a congressional statute. See City of Albuquerque v. U.S. Dep't of Interior, 379 F.3d 901, 913 (10th Cir. 2004) (citing cases). Second, neither the statutory foundation nor the executive order itself must preclude judicial review. 5 U.S.C. § 701(a)(1). Third, there must be "law to apply" - that is, there must be an objective standard by which a court can judge the agency's actions.  See 5 U.S.C. § 701(a)(2); Heckler v. Chaney, 470 U.S. 821, 830 (1985).  If an executive order meets these requirements it can be enforced through judicial action.  City of Carmel-by-the-Sea, 123 F.3d at 1166.

Here, the executive orders at issue rest upon NEPA.[34] Neither NEPA nor the orders themselves preclude judicial review, and the executive orders outline objective standards by which the Court can judge NPS's actions.  Thus, the conduct is subject to judicial review for compliance with Executive Orders 11,644 and 11,989 under the APA standard of review. See City of Carmel-by-the-Sea, 123 F.3d at 1166 (finding that agency compliance with executive orders was subject to judicial review under the APA because the orders were issued in furtherance of NEPA, among other statutes); S. Utah Wilderness Alliance v. Sierra, No. 1:08-cv-195, 2008 WL 4643003, at *3 n.3 (D. Utah Oct. 20, 2008) (finding Executive Order 11,644 and Executive Order 11,989 can be enforced under the APA); W. Watersheds Project v. Bureau of Land Mgmt., 629 F. Supp. 2d 951, 966-67 (D. Ariz. 2009) (collecting cases).

---

[34] Both Executive Order 11,644 and Executive Order 11,989 state that the directives therein are "in furtherance of the purpose and policy of the National Environmental Policy Act."  See 37 Fed. Reg. 2877; 42 Fed. Reg. 26959.

Executive Orders 11,644 and 11,989 provide that each respective agency head shall develop and issue regulations and administrative instructions regarding ORV trails, and that the designation of ORV areas and trails shall be in accordance with the following relevant criteria:

> (1) Areas and trails shall be located to minimize damage to soil, watershed, vegetation, or other resources of the public lands.

> (2) Areas and trails shall be located to minimize harassment of wildlife or significant disruption of wildlife habitats.

37 Fed. Reg. 2877 § 3(a)(1),(2).

As summarized earlier, under the APA, agency action is "arbitrary or capricious" if the agency has failed to articulate a "rational connection between the facts found and the choice made." Sierra Club, 295 F.3d at 1216. Because the Court has recommended that the administrative record does not reflect that the NPS's decisions were arbitrary and capricious, the Court recommends that Plaintiffs' motion for summary judgment as to Count Three be denied.

## IV. CONCLUSION

In sum, the undersigned recommends that summary judgment should be granted in favor of the Defendants as the Addition GMP/EIS complied with the APA and all other statutes cited by Plaintiffs in their Complaint.

Accordingly, it is now

**RECOMMENDED:**

(1) Plaintiffs' Joint Motion for Summary Judgment (Doc. #103) be **DENIED**.

(2) Federal Defendants' Combined Memorandum in Support of Cross-Motion for Summary Judgment and in Opposition to Plaintiffs' Joint Motion for Summary Judgment (Doc. #106) be **GRANTED**.

(3) Defendant-Intervenor Safari Club International's Combined Cross-Motion for Summary Judgment/Memorandum in Support and Opposition to Plaintiffs' Joint Motion for Summary Judgment (Doc. #108) be **GRANTED**.

(4) Florida Wildlife Federation's Cross-Motion for Summary Judgment and Combined Memorandum of Law in Support of Cross-Motion for Summary Judgment and in Opposition to Plaintiffs' Joint Motion for Summary Judgment (Doc. #110) be **GRANTED**.

(5) Intervenor Florida Fish and Wildlife Conservation Commission's Motion for Summary Judgment, Memorandum in Support Thereof, and Memorandum in Opposition to Plaintiffs' Motion for Summary Judgment (Doc. #111) be **GRANTED**.

Failure to file written objections to the proposed findings and recommendations contained in this report within fourteen (14) days from the date of its filing shall bar an aggrieved party from attacking the factual findings on appeal.

**Respectfully recommended** at Fort Myers, Florida, this 31st day of January, 2013.

SHERI POLSTER CHAPPELL
UNITED STATES MAGISTRATE JUDGE

Copies:  All Parties of Record

74